**VOLKSWAGEN INTERAMERICANA, S.A., Defendant, Appellant,**

v.

**Henry ROHLSEN, Plaintiff, Appellee.**

**No. 6634.**

United States Court of Appeals First Circuit.

May 17, 1966.

Raymond J. Falls, Jr., New York City, with whom Stephen A. Greene, Cahill, Gordon, Reindel & Ohl, New York City, McConnell, Valdes & Kelley, San Juan, P. R., and Gonzalez, Gonzalez-Oliver & Novak, Santurce, P. R., were on brief, for appellant.

John D. Marsh, Christiansted, St. Croix, V. I., with whom Young, Isherwood & Marsh, Christiansted, St. Croix, V. I., and Dubon & Dubon, Santurce, P. R., were on brief, for appellee.

Before ALDRICH, Chief Judge, MARIS * and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This is an action brought under the so-called Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225, hereinafter Dealers' Act, by one Rohlsen, a former Volkswagen dealer in St. Croix, Virgin Islands, against the regional Volkswagen distributor, Volkswagen Interamericana, S.A., a Mexican corporation. The suit was instituted in the United States District Court for the District of Puerto Rico. Process was served on the manager of Volkswagen de Puerto Rico, hereinafter VWPR, a local dealer franchised by defendant, as defendant's alleged agent. The jury returned a verdict for the plaintiff in the amount of $300,000. Defendant's appeal raises, at the outset, questions of jurisdiction.

Little time need be spent over defendant's reliance upon a provision of the franchise agreement restricting actions to the courts of Mexico. We need not consider whether this provision is sufficiently reasonable that it should be respected in an ordinary suit arising out of the contract. See Wm. H. Muller & Co. v. Swedish American Line Ltd., 2 Cir., 1955, 224 F.2d 806, 56 A.L.R.2d 295, cert. den. 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793. The Dealers' Act contains its own venue provisions,[1] which are very broad, and are designed to assure the dealer as accessible a forum as is reasonably possible. Cf. Snyder v. Eastern Auto Distributors, Inc., 4 Cir., 1966, 357 F.2d 552, cert. den. June 13, 1966, 86 S.Ct. 1889. The very purpose of the act is to give the dealer certain rights against a manufacturer independent of the terms of the agreement itself. Cf. Barney Motor Sales v. Cal. Sales, Inc., S.D.Cal.1959, 178 F.Supp. 172, 175. This protection would be of little value if a manufacturer could contractually limit jurisdiction to a forum practically inaccessible to the dealer. The act cannot so easily be thwarted. Cf. Boyd v. Grand Trunk Western R. R., 1949, 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55.

Defendant further alleges that it was not present in Puerto Rico so as to be amenable to suit there, and that it was not properly served with process. If defendant is subject to jurisdiction in Puerto Rico, it is only because of defendant's relationship with its franchised Puerto Rico Volkswagen dealer, VWPR, and it is to this that we turn.

It was uncontroverted that Krause, Hennings, and Reuss, the president, finance director, and managing director of defendant, were, respectively, the president, vice-president, and a director of VWPR. Hinke, a vice-president and director of VWPR, was one of defendant's

---

* By designation.

1. Suit may be brought in any district in which the defendant "resides, or is found, or has an agent." 15 U.S.C. § 1222.

two chief shareholders, the other one being Krause. From this, although the record is confused as to the actual ownership of VWPR, it could reasonably be concluded that defendant exercised direct control over the Puerto Rico dealership. We do not rest on this alone. Although VWPR's franchise agreement was not introduced into evidence, the plaintiff's was. It was a printed form, and, in the absence of contrary evidence, we think it not unreasonable to infer that it was standard, and that VWPR's agreement subjected it to no less control by defendant.[2] Under the form franchise, defendant reserved the right to control, inter alia, the dealer's automobile and spare parts inventory, its area of distribution, the number of salesmen and customers' service personnel in its employ, and even its stationery and business forms. Defendant further reserved the right to inspect, at its will, the dealer's premises and all of its business records.

■■ The due process clause sets the outer limits on assertion of jurisdiction over a foreign corporation.[3] The basic standard, enunciated in International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and developed in subsequent decisions, is that the foreign corporation must "have certain minimum contacts with [the forum] * * * such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Id. at 316, 66 S.Ct. at 158.

When jurisdiction is asserted over a foreign corporation because of its relationship with a local person or corporation, the nature and extent of this relationship, as well as the relevance of the subject-matter of the suit to defendant's affairs within the state are of significance. Defendant's dealers were not mere buyers, or outlets for its products, but, as we have indicated, were subject to its detailed supervision and control. Virtually indistinguishable franchises have been held sufficient to subject a foreign manufacturer or distributor to suit in the jurisdiction of its local dealer. Snyder v. Eastern Auto Distributors, Inc., supra; Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 5 Cir., 1964, 332 F.2d 135, cert. den. 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185; Fiat Motor Co. v. Alabama Imported Cars, Inc., 1961, 110 U.S.App.D.C. 252, 292 F.2d 745, cert. den. 368 U.S. 898, 82 S.Ct. 175, 7 L.Ed. 2d 94. Although interlocking ties of corporate control, such as common directors and officers, may not in themselves be sufficient to subject the foreign corporation to local jurisdiction, Cannon Mfg. Co. v. Cudahy Packing Co., 1925, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634, they are relevant factors, and lend support to jurisdiction based on this contractual reservation of control. Boryk v. deHavilland Aircraft Co., 2 Cir., 1965, 341 F.2d 666; cf. Fooshee v. Interstate Vending Co., D.Kan., 1964, 234 F.Supp. 44.

■ When, as here, a foreign defendant's contacts with a forum are substantial, a suit may be maintained though it concern a matter having no connection with the forum. Perkins v. Benguet Consol. Mining Co., 1952, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485. In the pres-

2. We note that standardization of franchises is common not only within the operations of a particular manufacturer or distributor, but in the automobile industry as a whole. Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1138–39 (1957).

3. Although Congress could provide for service on an American corporation anywhere in the United States, Mississippi Publishing Corp. v. Murphree, 1946, 326 U.S. 438, 442, 66 S.Ct. 242, 90 L.Ed. 185, it is likely that federal assertion of jurisdiction over corporations organized un-

der the laws of foreign countries is circumscribed by the due process clause of the fifth amendment. Cf. United States v. Scophony Corp. of America, 1948, 333 U.S. 795, 818, 68 S.Ct. 855, 92 L.Ed. 1091; United States v. Imperial Chemical Industries, Ltd., S.D.N.Y., 1951, 100 F.Supp. 504, 511. In any event. in federal question cases, the courts have tested the amenability of any foreign corporation to suit by reference to the standards developed under that clause. Lone Star Package Car Co., Inc. v. Baltimore & O. R. R., 5 Cir., 1954, 212 F.2d 147; Ostow & Jacobs, Inc. v. Morgan-Jones, Inc., S.D.N.Y.1959, 178 F.Supp. 150.

ent case, moreover, the suit is not unrelated to Puerto Rico: throughout the period of the franchise, VWPR acted as agent for defendant in relation to its business with plaintiff. Cf. Fiat Motor Co. v. Alabama Imported Cars, Inc., supra.

 Defendant could not carry on substantial economic activities within this country and at the same time claim to be absent when distasteful consequences ensued. Defendant was subject to personal jurisdiction in Puerto Rico, and was properly served by service upon VWPR's managing agent. Fed.R.Civ.P. 4(d)(3); Lone Star Package Car Co. v. Baltimore & O.R.R., supra, note 3.

We come next to the question whether defendant is a party who can be sued under the Dealers' Act. Section 1222 provides only for "suit against any automobile manufacturer." Section 1221(a) states,

"The term 'automobile manufacturer' shall mean any * * * business enterprise engaged in the manufacturing or assembling of [motor vehicles] * * *, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles."

Defendant's position is that, although by section 1221(a) suit can be brought against a manufacturer for the misconduct of its distributor, the act does not authorize suit against the distributor itself. Defendant further contends that it was not a distributor acting for and under the control of a manufacturer.

 We agree with defendant that the Dealers' Act is aimed at automobile manufacturers, not at distributors, as such, and that the inclusion of certain distributors in section 1221(a) was designed only to prevent a manufacturer from circumventing its responsibilities under the act by transacting business with its dealers through alter egos. We do not conclude from this, however, that when the manufacturer has acted through a distributor over whom it exercises the requisite control, suit cannot be brought against the distributor as well. It is basic agency law that an agent who has injured a third party cannot defend on the ground that he did so at the bidding of another. Indeed, if he so acts, he must do so subject to any special liability or disability that would attach to the principal for whom he is acting. It is entirely consistent with both the purpose and language of the act to hold that "automobile manufacturer" means, inter alia, "automobile distributor," when the distributor is subject to the manufacturer's control. Barney Motor Sales v. Cal Sales, Inc., supra.

Defendant's assertions that this requisite relationship was lacking, and that the court erred in excluding evidence relating to control, are based upon a misconception of the appropriate standard. Defendant is doubtless correct in suggesting that if the distributor is but an "instrumentality" of the manufacturer, in the special sense that the term is used in corporation law, this is a sufficient basis for bringing the distributor within the act. It is not, however, the only basis. "Acts for and is under the control of * * *" describes with equal aptness the relation between certain agents and their principals. A manufacturer can exercise the same kind of control through contractual provisions with a stranger as it can by owning and directing a subsidiary corporation, and evasion of its responsibilities by either method would equally undermine the purposes of the act. We believe the provision in question should be interpreted in the context of general agency law. It is sufficient that the distributor "is subject to the [manufacturer's] * * * control or right to control." Restatement (Second), Agency, § 220(1); Reconstruction Finance Corp. v. Merryfield, 1 Cir., 1943, 134 F.2d 988, 991.

Under the terms of defendant's franchise from the automobile manufacturer, Volkswagen G.m.b.H., defendant was subject to the manufacturer's control in much the same way and to much the

same extent as defendant's franchised dealers were subject to its control. Furthermore, the agreement obligated defendant to supervise and enforce its dealers' compliance with the manufacturer's regulations. It was not error to exclude defendant's proffered evidence as to the manufacturer's actual involvement with plaintiff's franchise. What matters is that it had the power.

Defendant next contends that the evidence does not support a verdict in plaintiff's favor on the merits. Before examining the record we must first inquire into the governing legal standards, which are not entirely clear from the face of the statute. Section 1222 requires the manufacturer to "act in good faith * * in terminating, canceling, or not renewing the franchise." Section 1221(e) defines "good faith" as

> "the duty of each party to any franchise * * * to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

For a manufacturer to condition continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se. It must appear that the condition was unfair or inequitable. To hold otherwise would not only circumscribe the manufacturer's freedom to do business to an extent we cannot believe contemplated by Congress, but would lead to the absurd result that a manufacturer could not insist upon the very terms of the agreement.

Initially, we think there is an important difference between two kinds of improper conditions that a manufacturer might impose and back up by threats. Particularly suspect under the act are conditions which benefit only, or primarily, the manufacturer—for example, requirements that a dealer purchase large stocks of vehicles, spare parts, special tools or advertising matter—as distinguished from requirements that would tend to work to the mutual advantage of both parties, for example, that the dealer improve its service, or managerial efficiency. The manufacturer can easily extort demands of the first sort, increasing its own profit at the expense of the dealer's; the act's legislative history indicates that this was of particular concern to the Congress. The latter sort, even if the demands may be thought excessive under the circumstances, should not, without more, indicate that the manufacturer is taking advantage of the dealer, or using the franchise as a weapon for extortion, since the manufacturer stands to profit from his demands only if the dealer profits as well.

The jury could have found that defendant imposed several requirements upon plaintiff which, under the above analysis, if improper, would fall into the first group—conditions directly benefiting the manufacturer, but not necessarily the dealer. Plaintiff's 1956 franchise required it to stock spare parts equal in cost to ten per cent of the value of its automobile stock; the 1958 franchise required him to purchase from defendant a welding machine, a line of Vespa motor scooters, a tractor, advertising materials, and tools; plaintiff was forced to sign the 1960 renewal contract without being given time to read its terms. Even if it be assumed that defendant acted unreasonably and coercively, not only did none of these events occur within the three-year statutory period before the action was commenced, 15 U.S.C. § 1223, but there is no evidence that plaintiff's unfavorable reaction, but nonetheless acceptance of them, contributed to the subsequent termination or nonrenewal of his franchise. This latter was all the complaint sought.[4] Kotula v. Ford Motor Co., 8 Cir., 1964, 338 F.2d 732, 736.

---

4. Plaintiff's listing these alleged losses in his brief to justify the size of the verdict was, accordingly, improper.

The jury could have found, as defendant contended, that defendant's reason for terminating the franchise was that plaintiff failed to meet defendant's standards of service, sales, efficiency, and appearance. Reading the record most favorably to plaintiff, we believe the jury could have found that the quality of his service was good; that his sales were adequate for the St. Croix area, and that any decline in sales during 1961 was due to circumstances beyond plaintiff's control; that the appearance of plaintiff's place of business, and its efficiency, were reasonable for that area; and that plaintiff's failure to meet various contractual commitments also were the result of events beyond his control. However, plaintiff's own evidence and admissions disclose that his performance could well have been better, and that it would not have been unreasonable for the manufacturer to conclude that, even if plaintiff's enterprise was not below par for the Virgin Islands, another, more enterprising dealer could overcome many of the difficulties encountered by the plaintiff, and better represent Volkswagen's interests in terms of service, sales and image.

As we have indicated, a disfranchised dealer does not make a case under the statute merely by proving that his performance was not below minimum limits. Plaintiff makes a special showing, however, intending to establish that it was not really his performance with which defendant was dissatisfied. In particular, plaintiff alleges that starting in 1960, defendant determined to take a direct share of the retail profits in the St. Croix area. Had defendant merely wished to own a dealership itself, it might have terminated plaintiff's franchise and formed its own enterprise. But plaintiff asserts that defendant wanted a direct share of the profits without making any, or any substantial, investment; that defendant threatened plaintiff with loss of the franchise unless he agreed to admit defendant to his operation; and that when plaintiff refused, defendant made good its threat. We turn to some of the relevant evidence.

In January 1961, defendant's manager and substantial stockholder, Hinke, proposed to two St. Croix real-estate brokers that a joint enterprise be formed in which defendant, plaintiff, and the brokers' group would each have a one-third interest. One of the brokers testified as to Hinke's proposal:

"They were to participate financially and supposedly to give us service help. * * * He [Hinke [5]] would have one-third of it, but I don't believe he was going to put in money. We rejected the idea."

Plaintiff testified that Hinke put essentially the same offer to him:

"[H]e made a proposition in which he wanted to set up a new business for the Volkswagen franchise and offered me 1/3 participation. These people would get 1/3 and Volkswagen would get 1/3. I asked concerning the capitalization and he said it was to be capitalized for $100,000 and I said to him, Mr. Hinke, the last statement we sent you showed that we had a business worth $230,000.00. How in the world could I invest this against the capitalization for 1/3 of the $100,000.00, I said this is untenable. He said, I can see how you think about it, but I think in the long run you would be much farther ahead. * * * " [6]

5. Throughout the record, Hinke and defendant are referred to interchangeably. The jury could have found that the interest was to be defendant's, and not Hinke's personally.

6. In view of plaintiff's restatement of Hinke's proposal in a letter of February 6, 1961, to Hinke, a jury could not have found that defendant proposed that all of the assets of plaintiff's present dealership were to be transferred to the new enterprise. In particular, the new dealership was to have a new building at a different site. The jury could have found, however, that defendant required that plaintiff invest $37,000 in addition to whatever part of its present investment would be transferred to the new enterprise.

Plaintiff rejected the offer at the time it was proposed, and Hinke left St. Croix. Immediately thereafter, Hinke wrote to plaintiff that defendant had decided "not to continue our relationship on the present basis, due to the fact that some of the essentials of the Volkswagen business in St. Croix have been overlooked. * * *" The jury could have found that when plaintiff came to Puerto Rico upon receipt of this letter, he threatened to go to Germany to complain of the treatment he was receiving from defendant, and that Hinke immediately changed his attitude and offered to, and for a short period did in fact, lend assistance to plaintiff. In January 1962, plaintiff opened up a new showroom, which, the jury could have found, was attractive in appearance and favorably displayed Volkswagen automobiles. On September 24, 1962 defendant wrote to plaintiff that all business relations between them had terminated for cause as of August 31, 1962.

To render a verdict in plaintiff's favor, the jury would have had not only to disbelieve contradictory testimony, but also to conclude that certain of defendant's conduct, superficially inconsistent with the motives plaintiff ascribes to defendant, was intentionally contrived to disguise defendant's true purposes. Some of defendant's conduct could lead a reasonable jury to that conclusion. For example, the jury might have found unconvincing and contrived Hinke's claim that he first came to St. Croix in the fall of 1960 because he was concerned with a "strong backward trend in the sales," in view of the fact that the sales up to his arrival in St. Croix were twice those of the previous year,[7] and that any decline in sales from the high point of the early months followed the usual seasonal trend of the four years in which plaintiff had been in business. The jury might further have believed that other criticisms of the plaintiff's operation—for example, that his servicing was poor —were false, or exaggerated.

We could agree with defendant that discussions with other persons looking towards their taking over a franchise, are not only not inconsistent with a claim that the dealer's performance was inadequate, but would be only natural. The case at bar was unusual, however, in that the contemplated change-over was one in which the defendant would share. On Hinke's own testimony, this would have been "a negative situation * * * very much contrary to our doings. We feel always that we should not enter the retail field." The jury might well have found inadequately explained why, in the light of this protestation, defendant sought to establish a new dealership in which it was to participate.[8] The jury could well find that the initially threatened termination was not in good faith. With this as a background, we believe that on the record as a whole there was a jury question whether defendant's termination of the franchise related to the conduct of plaintiff's agency, or to his rejection of the defendant as a partner upon unreasonable terms. If the latter, it was a clear violation of the Dealers' Act.

Defendant next contends that the Dealers' Act "is unconstitutional both by virtue of its arbitrary distinctions unrelated to the public interest and because of the vagueness of the standard of conduct which it purports to legislate."

■ Defendant cites no cases in support of its first argument and we doubt

---

7. They were also substantially greater than 1957, and only slightly below the sales for 1958.

8. Defendant complains because plaintiff was permitted to introduce testimony, following Hinke's above-quoted statement on direct, that defendant, after unsuccessfully attempting to buy into the business of its Puerto Rico dealer, cancelled the franchise and substituted VWPR. Defendant may be correct that this incident would not be admissible to contradict Hinke's statement that defendant's "general policy" was not to terminate dealerships. But it was certainly admissible to rebut Hinke's claim that defendant had no interest in participating in plaintiff's business because it never entered the retail market.

that it could find substantial support in any case decided within, at least, the last quarter century. The legislation was enacted in the context of committee findings of widespread abuse by automobile manufacturers of their franchised dealers. H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956); S.Rep. No. 2073, 84th Cong., 2d Sess. (1956), U.S.Code of Congressional and Administrative News 1956, p. 4596. It is clearly responsive to this problem, and not only gives protection to the approximately 40,000 franchised automobile dealers in the United States—a sufficient "public purpose" in itself—but could be found to redound to the ultimate benefit of the public at large. See 102 Cong.Rec. 4848, 7482 (1956).

■■■ For its second point, defendant relies chiefly on General Motors Corp. v. Blevins, D.Colo., 1956, 144 F. Supp. 381, which struck down an analogous state statute. Although *Blevins* involved penal sanctions, and "the standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanctions for enforcement," Winters v. People of State of New York, 1948, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840, we will not say that a civil statute could not be so vague as to offend the due process clause. Without expressing any view as to the correctness of *Blevins,* however, we think it is significantly different from the case at bar. The state legislation punished a manufacturer who "unfairly, without due regard to the equities of said dealer and without just provocation, cancelled the franchise of any motor vehicle dealer." While the federal Dealers' Act imposes a requirement of "good faith," section 1221(e), as we discussed at some length above, narrows the meaning of that term to a considerable extent. It may be true that the statute in effect delegates some responsibility to the courts to refine and develop standards under the act on a case-by-case basis, but this is neither unusual nor unconstitutional. Cf. Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S.

448, 77 S.Ct. 912, 1 L.Ed.2d 972. Whatever might be said about the Dealers' Act if it subjected a manufacturer to criminal penalties, we hold that it is sufficiently clear to withstand a constitutional challenge of vagueness. Blenke Brothers Co. v. Ford Motor Co., N.D. Ind., 1962, 203 F.Supp. 670.

■■■ Defendant raises a number of less fundamental questions, all of which we have considered, but only one of which merits comment. This relates to the alleged prejudicial behavior of the trial court. Review of the record reveals nothing of any possible moment, except for some occasional sharp remarks to defendant's counsel. The reason, and justification, for these remarks, however, is quite apparent. It is inappropriate for counsel to complain of treatment he has invited, particularly when that treatment is well within responsive limits. We have said before, and we repeat, such claims should not be made at all unless they are very sound. The proposition that counsel can disregard the court's instructions, obtain a rebuke, and then preserve the incident as insurance in the event the case is lost, does not sit well.

■■■ There remains the matter of damages. Perhaps the best introduction to the subject is to mention two of the more extraordinary of the arguments made in this court. Defendant contends that the plaintiff's income tax return should not be considered because it was introduced *"by the defendant"* (ital. in orig.), and would not have been competent if offered by the plaintiff. It is true that this, and some other evidence in fact favorable to the plaintiff, was introduced by the defendant, but it is a novel concept that evidence is available only to the party who introduces it. Plaintiff evens the score, however, by arguing that possible errors in the court's charge as to certain items of damages need not be noticed because the jury might have reached the equivalent monetary result by some other route. This argument is not quite so original, but no better. Neither it, nor any other argument can overcome the court's error in

permitting the jury to find that if plaintiff had received the last 117 cars he had ordered (for only 25 of which he had firm orders from customers), his profit on all 117 would have been the same as the gross mark-up. Manifestly there would have been some expense, even if all had ultimately been sold. It was likewise error, particularly when defendant had expressly offered to take useless parts and inventory off plaintiff's hands, for the court to refuse to charge on plaintiff's duty to mitigate the damages which plaintiff claimed for being left with this material.

These were substantial errors. The court also erred in charging the jury that the contract had never been terminated. The basic agreement may have been automatically renewed in 1961 and 1962, but defendant's unequivocal letter of September 24, 1962 clearly operated to terminate the franchise.

Whether defendant adequately saved its rights with respect to certain other damage matters we need not determine. Since we hold there must be a new trial on this issue, we will consider them in any event. We think the court was exceptionally liberal in permitting the plaintiff to testify to figures concerning his profits and the value of the franchise off the top of his head, without reference to books and records. Possibly the defendant's only remedy was cross-examination. Possibly, too, before another trial, the defendant will want to take plaintiff's deposition in St. Croix where the records are. Second, we find most unrealistic plaintiff's self-evaluation of his franchise on a 6% basis in his brief before us, so that an income of $18,000 made it worth $300,000.[9] This was surely impermissible when $18,000 was plaintiff's best year, and in the next he lost $12,000. As we look at the record as a whole, more evidence, and a detailed explanatory charge, should have been required on any franchise valuation claim.

 Finally, we find no basis in the Dealers' Act for allowing plaintiff to recover damages for injury to his reputation caused by the termination. The parties have given us no assistance here, but we think a close analogy can be found in the rule that such damages cannot be recovered for breach of an employment contract. Mastoras v. Chicago, M. & St. P. Ry., W.D.Wash. 1914, 217 F. 153; Sinclair v. Positype Corp. of America, 1933, 237 App.Div. 525, 261 N.Y.S. 900. Plaintiff should not have been allowed to claim that the mere termination of his dealership was a personal reflection.

Judgment will be entered vacating the judgment of the District Court and the verdict of the jury insofar as it made an assessment of the damages. The finding of liability will stand and a new trial ordered on the issue of damages.

9. An even more pretentious argument was made to the jury.