**MARTIN MOTOR SALES, INC.,**
**Plaintiff,**

v.

**SAAB–SCANIA OF AMERICA, INC. and**
**Saab-Scania (AB), Defendants.**

**72 CIV. 5380.**

United States District Court,
S. D. New York.

Jan. 26, 1978.

---

Daniel Rosen by Bernard Flaton, New York City, for plaintiff.

Wiggin & Dana by William J. Doyle, Jeremy G. Zimmermann, New Haven, Conn., for defendants.

Findings of Fact and Conclusions of Law

MOTLEY, District Judge.

Martin Motor Sales, Inc. (Martin Motors), plaintiff, is a family-owned New York Corporation. Martin Motor's business is selling automobiles. Defendant Saab-Scania (AB) (Saab-Sweden) is the Swedish corporation which manufactures the Saab automobile. Its co-defendant, Saab-Scania of America, Inc. (Saab-America) is a wholly owned subsidiary of Saab-Sweden. Saab-America is a Connecticut corporation. It is in the business of importing and distributing Saab automobiles and parts to dealers in the United States such as Martin Motors.

Jurisdiction is based on diversity of citizenship. In addition, federal question jurisdiction arises under 15 U.S.C. §§ 1221 et seq., the Automobile Dealers' Day in Court Act (Act). Plaintiff claims that defendants violated 15 U.S.C., § 1222 [1] when defendant unilaterally terminated plaintiff's two Saab franchises in the Bronx and Manhattan. Plaintiff claims that defendant acted in bad faith since the termination of the franchises was aimed at penalizing plaintiff for its refusal to buy outdated and mechanically defective Saabs from Saab-America.

Section 1222 reads in pertinent part:

---

1. Plaintiff offers numerous other theories under which it claims the same amount of damages.

These other claims need not be reached, see *infra* p. 1051.

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, . . . and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

A bench trial was held on twelve non-consecutive days between January 12, 1977 and February 23, 1977. The court now finds that plaintiff should prevail on its claim that defendants violated 15 U.S.C. § 1222. Damages are awarded in the sum of $36,840.

Findings of Fact on Liability

Martin Schlanger is the president of Martin Motors and took over the operation from his father in 1963 at age 25. At that time the business of Martin Motors was the sale of used cars. Since then the company has entered into numerous new car franchises. In January 1964 Martin Motors began its formal relationship with Saab by signing a Dealer's Selling Agreement (DSA) with Saab-America on January 1, 1964 for the sale of Saabs in the Bronx at 766 Southern Boulevard. On November 8, 1967 Martin Motors and Saab-America signed a DSA for a franchise in the Bronx and for one in Manhattan at 1274 Second Avenue. Subsequent DSAs were signed for these two franchises in 1969. Martin Motors was the only Saab dealer in the Bronx and Manhattan. On December 16, 1970 a DSA was signed for 1274 Second Avenue.

The substance of plaintiff's complaint is that its Manhattan and Bronx franchises were either unlawfully terminated by defendants or not renewed by them in bad faith.

Although Martin Motors maintained a separate location in the Bronx and in Manhattan for the service of the new cars which it sold, Saab-America had never required separate franchises for these service facilities. It required franchise agreements only for those two locations where the cars were actually sold. Despite the fact that Martin Motors moved its facilities in the Bronx to 1965 Jerome Avenue with Saab-America's knowledge and consent and its service facility in Manhattan to 406 East 91st Street, the terms of the DSA's never varied.

In late 1971 Martin Motors again moved its Manhattan service facility while keeping its location at 1274 Second Avenue for the sale of new Saabs. With the consent of all franchisors of Martin Motors, including Saab-America, plaintiff opened its new facility at 700 11th Avenue (11th Avenue) on January 4, 1972. It sold other brands of new automobiles at 11th Avenue, but it sold no Saabs there. It used that location for the storage and service of Saab vehicles and the sale of Saab parts.

The lease for 11th Avenue was signed on November 13, 1971. Shortly thereafter, Martin Motors and Saab-America entered into discussions as to whether Saab would be interested in another Manhattan franchise.[2] Plaintiff would benefit because in addition to adding an additional sales outlet in Manhattan, plaintiff could obtain additional advertising subsidies from Saab-America.

As a condition for the new franchise, Saab-America demanded that plaintiff order 30 Saab vehicles. This number was finally set at 21 by both parties, but plaintiff still objected to the "mix" of cars which Saab demanded that it take. Many of these cars were 1971 models which admittedly had defects giving rise to many mechanical problems. Saab's goal was to shift the burden of selling these undesirable automobiles from itself to Martin Motors.

2. The evidence is unclear as to whether Martin Motors or Saab-America initiated the discussions relating to an 11th Avenue franchise.

By May 1972 the parties had still not renewed the franchises in Manhattan and the Bronx. Saab's position in May 1972 was essentially that, as a condition for the renewal of these two franchises, Martin Motors must apply for a new 11th Avenue franchise and accompany this with an order for Saab's predetermined "mix" of 21 automobiles.

Martin Motors did order 21 cars as agreed but steadfastly refused to order the "mix" which was demanded by Saab-America. Relations broke down over this issue. By letter dated June 29, 1972 from W. Donald Carmack, Vice President of Sales for Saab-America, Martin Motors was denied a new franchise for 11th Avenue because it refused to agree to order the 21 cars designated by Saab-America. On June 30, 1972 Martin Motors received a letter from J. J. Upham, President of Saab-America, informing plaintiff that its DSA for the Bronx and Manhattan would not be renewed "when it terminates on September 30, 1972." Upham's subsequent letter on July 10, 1972 superseded the June 30 one and informed Martin Motors that its DSA had expired on September 30, 1971.

Defendants claim that plaintiff's franchise was terminated because plaintiff's sales of new Saabs had fallen drastically from the previous year and, among other things, plaintiff allowed its inventory of spare Saab parts to fall well below acceptable levels. The reason for this lackadaisical attitude, claims defendants, is that plaintiff was disgruntled over Saab-America's new policy of refusing to pay plaintiff annual subsidies to compensate plaintiff for doing business in the high cost metropolitan area. These subsidies, of admittedly questionable legality, ranged from $35,000 to $85,000 per year.

The court finds that Martin Motors' franchises for the Bronx and Manhattan were terminated because of its refusal to purchase the mix of 21 cars designated by Saab-America. In 1971 plaintiff sold the most Saabs in his "district" and "region" and ranked in the first ten dealers nationally with respect to sales volume. 1971 was also a record year for plaintiff for new Saab sales. Although sales did falter in the first half of 1972, the reason for this was doubtless due to the continuing dispute over Saab-America's demand that Martin Motors buy the specified "mix" of cars. Martin Motors nevertheless sold 55 cars in the first half of 1972.

The court finds that the "poor sales" rationale is a subterfuge for the real reason for cancellation and refusal to renew. There were numerous letters from Saab-America in the first half of 1972 relating to the 11th Avenue location and its demand that plaintiff purchase a "mix" of Saabs. Not one letter referred to plaintiff's alleged poor sales performance. Not a single letter urged plaintiff to improve its sales. Not a single letter warned plaintiff that unless its performance improved, its franchises would be terminated. If its poor sales and poor inventory control were the reason for the franchise termination, there would have (or at least should have) been a clear record of this fact in writing prior to the termination and, if not, by proof at trial.

Conclusions of Law on Liability

Both Saab-America and Saab-Sweden maintain that the court need not reach the question of whether the facts found above would render them liable under the Act since, for reasons unique to each defendant, the action must be dismissed. Saab-America argues that it is neither a "manufacturer" of automobiles, nor is it "under the control" of a manufacturer. 15 U.S.C. § 1221(a). Saab-Sweden argues that Saab-America, and not itself, entered into a franchise agreement with plaintiff. Since Saab-Sweden was not a party to the franchise, it could not have violated the act by terminating or failing to renew that franchise.

On July 30, 1974, before any testimony had been taken in the case, the court rendered an opinion denying Saab-Sweden's motion to dismiss for lack of personal jurisdiction. The court held that based on the facts available to it at that time, Saab-Sweden was "transacting business" in New

York through its agent, Saab-America. This was sufficient to establish personal jurisdiction under N.Y.C.P.L.R. § 302(a)(1). It followed that there was jurisdiction under the Act, 15 U.S.C. § 1222, which reads, in pertinent part:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found or has an agent . . .

The court now reaffirms its holding of July 30, 1974.

The jurisdictional facts may be summarized: Saab-America is a wholly owned subsidiary of Saab-Sweden. The business of Saab-America is to import Saab automobiles and distribute them to franchises in the United States. Saab-America exercises day to day supervision of these franchises in order to assure that they meet Saab's standards. There was no evidence that Saab-Sweden was involved in importing its products to the United States, thus Saab-America performed this vital function for its parent company. Without Saab-America, Saab-Sweden would have had to import these automobiles itself.

Saab-Sweden maintained a general supervisory role over the United States operations of its subsidiary. It sent representatives here to inspect franchise facilities and to recommend improvements required to maintain Saab's standards of service. Representatives from Saab-Sweden trained plaintiff's personnel. Saab-Sweden invited franchisees to tour its Swedish manufacturing facilities; Martin Schlanger did travel to Sweden on at least one occasion and other personnel of plaintiff went there on numerous other occasions.

The facts in this case are strikingly similar to those in *Sunrise Toyota, Ltd. v. Toyota Motor Co., Ltd.*, 55 F.R.D. 519 (S.D.N.Y. 1972). In *Sunrise,* Judge Lasker held that Toyota was "doing business" in New York through its importing and distributing agent in the United States. This finding of agency was sufficient to establish jurisdiction under 15 U.S.C. § 1222. *See also Au-*towest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2d Cir. 1970).

■ Saab-America is the agent of Saab-Sweden. As such, it is a "manufacturer" under 15 U.S.C. § 1221(a) and is liable under 15 U.S.C. § 1222. Saab-Sweden is also liable under the latter section since it transacts business in New York through its agent.

■ An extended discussion is not necessary to demonstrate that defendants have violated the Act and are liable to plaintiff for damages. The court has found that the franchise was either not renewed or terminated because plaintiff refused to buy outdated model cars and cars which suffered from a history of mechanical problems. These are precisely those kinds of abuses which Congress attempted to eliminate by passing the Act. *David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 56 (4th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *American Motor Sales Corporation v. Semke*, 384 F.2d 192, 197 (10th Cir. 1967); *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437, 442 (1st Cir.), *cert. denied* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966) ("[p]articularly suspect under the act are conditions which benefit only, or primarily, the manufacturer . . . ."—such as requiring the dealer to buy unwanted automobiles); *Woodward v. General Motors Corporation*, 298 F.2d 121, 127–28 (5th Cir. 1962), *cert. denied* 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962).

It is not necessary for the court to rule on any of plaintiff's other eight causes of action. All but three pray for the identical amount of damages which plaintiff argues was caused by defendants' breach of the Dealers' Day in Court Act. Presumably, the measure of damages would be precisely the same for each of these causes of action. Plaintiff's Fourth cause of action asks for treble damages for violation of the antitrust laws. That claim has been abandoned since no mention is made of any antitrust statutes in plaintiff's post-trial brief. Plaintiff's Eighth cause of action prays for

**1052**

punitive damages based on defendants' fraud. Plaintiff has not sustained his burden of proving fraud. Finally, the Ninth cause of action is moot since it prays for an injunction pending the determination of this action.

### Findings of Fact and Conclusions of Law on Damages

Plaintiff's complaint prays for damages in the sum of $15,030,800. This claim has been scaled down after trial;[3] a total of $8,250,000 is requested in plaintiff's proposed findings of fact. In addition, plaintiff also asks for an award of attorney's fees pursuant to 15 U.S.C. § 1222.

The claimed damage figure is arrived at as follows: The termination of the Saab franchise cost plaintiff lost profits of $50,000 for lost sales of new Saabs; $20,000 for lost sales of used automobiles; $60,000 for lost sales of parts; $120,000 in lost labor charges. The sum of these individual losses is $250,000. Plaintiff claims that it would have retained the Saab franchise for Martin Schlanger's lifetime—which was an expected 33 more years at the time of termination. Thus, $250,000 lost profits for 33 years equals $8,250,000.

The court rejects this figure and awards damages in the sum of $36,840.

### Measure of Damages

■ Under the Automobile Dealers' Day in Court Act the proper measure of damages is the profits which the dealer would have earned from the franchise for as long as the dealer would have retained the franchise in the future. *Autowest, supra,* 434 F.2d at 563–67; *Randy's Studebaker Sales, Inc. v. Nissan Motor Corporation,* 533 F.2d 510, 518 (10th Cir. 1976).

The finder of fact cannot but despair at the dual nature of the speculation involved in this calculation under the best of circumstances: First, what would be the future profits of a multi-line dealership considering the vagaries of the business as well as the unpredictable course of our economy? Second, how long would the dealer have retained the franchise in the absence of the manufacturer's bad faith? The difficulty of these calculations has been noted. Note, *The Elusive Measure of Damages for Wrongful Termination of Automobile Dealership Franchises,* 74 Yale L.J. 354 (1964).

■ The standards of calculating damages under the Act are generally undisputed. It is improper to speculate as to the *existence* of any damage caused by the defendant, but uncertainty as to the *amount* is permissible. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931). The speculative nature of the damage award should not bar an award where the uncertainty was caused by the defendant's misconduct. *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 455 (2d Cir. 1977).

Pure speculation or guesswork and estimates based on false or unreasonable assumptions are unacceptable. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Autowest, supra,* 434 F.2d at 566.

Unfortunately, the unavoidably difficult calculation of plaintiff's damages is further complicated by the fact that, in computing its damages, plaintiff did not analyze its business records until *after* the trial had begun.[4] By that time the analysis was in-

3. In his complaint, plaintiff claimed that it initially moved into Manhattan, and also made certain moves into new Bronx and Manhattan facilities, at the insistence or encouragement of Saab-America. Martin Motors has calculated the cost of these moves and originally included these costs as damages. It appears that plaintiff has abandoned this claim after trial. Those monies spent on improving the new facilities would not have been recoverable: damages were not shown since the facilities were still being used productively at time of suit; many expenditures for improvements were not connected in any way to Saab-America; even if it were shown that there *was* damage *caused* by Saab-America's breach, to compensate for such damage *and* also to award lost future profits would constitute double recovery.

4. At his deposition in March 1976, plaintiff's accountant, Samuel Gordon, estimated lost gross profits without the aid of business records. After trial had begun, plaintiff did not fundamentally alter its gross profit theory, but

complete both because records had been lost or destroyed and because time was too short to do a thorough job. At least one court has declined to award damages under similar circumstances noting that those records which were not produced must be assumed to be unfavorable to the plaintiff and that without the records, any estimate of plaintiff's damage was simply speculation and conjecture. *Cecil Corley Motor Co., Inc. v. G. M. C.,* 380 F.Supp. 819 (M.D.Tenn.1974).

This case need not be treated as harshly since there are records from which to base a damage calculation. The testimony of Martin Schlanger, president of Martin Motors was very credible at trial. The court attributes the lack of records more to poor trial preparation than to a fear that the records would conclusively show a lack of damages. In addition, defendants were given a full opportunity by plaintiff to inspect any business records they chose at the premises of plaintiff.

■ However, the court feels that in this type of case, where the proof of damages is so difficult and speculative under the best of circumstances, plaintiff is obligated to offer the court the best evidence available in proving its damages. It is not necessary to prove each damage amount to the penny and expend inordinate sums for accountants' testimony.[5] Estimates based on sound sampling techniques would suffice. *See, Volkswagen Interamericana, S.A. v. Rohlsen, supra,* 360 F.2d at 446.

■ In the instant case, as will become apparent, *infra,* plaintiff often did not substantiate its calculations with easily obtainable records. The court will therefore discount any estimates which could have been substantiated by hard data and will apply a lesser discount to estimates based on incomplete or "second best" data. In the process

of resolving all doubts in favor of the defendants, the court feels that lost profits will be understated while still partially compensating plaintiff for the damage caused by the defendants. It should also be noted that during trial certain "estimates" made by Schlanger and his accountant, Samuel Gordon, were later shown to be incorrect after the relevant records had been examined. The court will apply a discount rate which will compensate for other possibly faulty estimates.

### Gross or Net Profit

■ The general rule is that the measure of "lost profits" is the net profit which is lost. *Autowest, supra,* 434 F.2d at 565; *Cecil Corley, supra,* 380 F.Supp. at 854; *Rea v. Ford Motor Co.,* 406 F.Supp. 271, 278–81 (W.D.Pa.1975); *Hannigan v. Sears, Roebuck and Co.,* 410 F.2d 285, 293 (7th Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969).

Plaintiff argues, however, that the measure of lost profits should be the gross profit less only those variable expenses directly associated with the sale of cars, parts and labor and which would not be incurred absent the sale. Variable expenses would include, for example, salesmen's commissions and would exclude, for example, that portion of the rent allocable to the Saab line.

In support of this theory, plaintiff argues that in a multi-line operation such as Martin Motors, the loss of a single line would have no measurable effect on its overhead expense. Automobile dealers operate on the "break even" theory of profit. They calculate their monthly overhead expense which is fixed and must be covered by the sale of new cars. Then they calculate the number of automobiles which must be sold monthly to meet that figure. When that number is sold any additional cars sold that

---

now substantiated many of its figures with hard financial data. These records have been available to defendants for inspection at all times. When it became apparent at trial that plaintiff was supporting its estimates with the financial statements, trial was adjourned to allow defendants this time to prepare their cross-examination of the accountant.

5. At one point in the proceedings plaintiff had suggested that such an analysis of the business records would be too costly. This is hardly an appropriate attitude for one claiming damages in excess of $8 million. In any case, the records were finally examined fairly expeditiously after the trial had begun.

month is pure profit measured by the selling price less the cost and any expenses directly associated with the sale. Thus, plaintiff claims that the loss of the Saab franchise came "off the top" of its profits and that the proper measure of profit is the gross profit less variable expenses earned on the Saab line.

We reject this theory and will substitute a hybrid in its stead. The court accepts plaintiff's claim that when the Saab franchise was terminated, plaintiff was unable to significantly reduce its overhead expense. The rent was fixed, insurance payments were not flexible, substantial savings could not be obtained through employee layoffs.[6] Martin Motors had three other franchises when it was terminated in 1972. Even if a portion of the overhead could have been allocated to Saab, this portion simply could not have been saved, practically speaking, when Saab terminated its franchise in 1972.

This Circuit has never dealt directly with the question whether the net profit rule should bend in the context of a suit under the Dealers' Day in Court Act where the plaintiff has a multi-line operation with fixed overhead. However, support for a gross profit theory may be found in *Transit Advertisers, Inc. v. New York, New Haven & Hartford R. Co.*, 194 F.2d 907, 911–12 (2d Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). Although that case held that the district court properly allocated a portion of overhead to arrive at a damage figure based on net profit, it did agree in principle with the argument that since the plaintiff was not relieved of this fixed cost after the defendant's breach, this portion of the overhead should not be deducted from the damage figure. What the Court apparently based its decision on in deducting overhead was the fact that:

> It is entirely proper to assume that these facilities, and work of these personnel were applied in part to this franchise and, but for it, *would have been available for other income producing work.* Consequently, the allocation of such expenses

was necessary to reflect the plaintiff's profit under the contract. 194 F.2d at 912. (emphasis supplied).

The instant case is distinguished from *Transit Advertisers* on two grounds. First, this court finds that based on the nature of the automobile franchise business and the nature of Martin Motors in particular, the personnel and facilities which had been used for Saab work could *not* have immediately been put to other income producing work. There was necessarily a slack period after the termination during which time personnel were underworked and facilities underutilized. Second, *Transit Advertisers* was not a case under the Act, which has since established a new federal cause of action, and did not consider the possibility of awarding gross profits for the first year only.

At least one other court has supported the use of a "variable net profit" theory, i. e., gross profit less variable selling expenses. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., supra*, 533 F.2d at 518 (award of variable net profits for a *ten year* period sustained). There is a suggestion in another case that such a theory may be proper. *Volkswagen Interamericana, S.A. v. Rohlsen, supra*, 360 F.2d at 446.

While acknowledging the fact that the overhead was fixed in the short run, this court emphatically rejects the notion that it was fixed in the long run. Martin Motor's own records disclose that the rent expense was substantially reduced after 1972 even *after* a new facility at 2100 Jerome Avenue was added. Also, despite the fact that there was unused space at 11th Avenue, plaintiff added more franchises to the new location at 2100 Jerome Avenue.

Plaintiff had a ten year lease at 11th Avenue to run through 1981. There was no testimony as to the potential for subletting the extra room made available by the termination of the Saab franchise, or the possibility of subletting the entire premises and moving to smaller quarters. In the absence of any testimony, the court must assume

---

**6.** Where there were savings in salaries, this fact is factored into the court's calculations.

that it was feasible to reduce the overhead by such a move. Quite clearly, all other "fixed" overhead expenses could likewise have been eventually reduced in the longer run.

The court will allow plaintiff an award of its gross profits less variable expenses saved for one year subsequent to the termination of the Saab franchise. This is a reasonable time for plaintiff to have adapted and planned various belt-tightening moves to compensate for the loss of Saab.

The measure of lost profit after the first year is the future net profit attributable to the Saab franchise which was lost, or the usual measure of lost profits.

Gross Profits Lost on Sales of New Saabs for the 1st Year [7]

The gross profits lost on the sale of new Saabs is measured by the selling price less the sum of the cost and those variable expenses which were directly attributable to the sale of new Saabs. This sum must then be multiplied by the number of new Saabs which Martin could have been expected to sell in the year subsequent to the termination.

The number of Saabs sold from 1967 to 1971 inclusive were 57, 138, 173, 161 and 226. 1972 is not a representative year because the dispute may have distorted the number of cars sold that year. An average of the last three years is a fair prediction of the number that would have been sold but for the defendants' breach, or 187 automobiles. This is close to plaintiff's estimate of 200 new cars.

The average gross profit per new Saab automobile [8] from 1967 to 1971 inclusive was respectively $143, $219, $277, $291 and $244. Profits for the year 1972 are not included because that year is not represent-

ative, being only part of a year and the time that the dispute raged between the parties. The profits show a yearly increase but for 1971. A fair estimate of expected gross profits per car would be an average of the last three years or $271. This accords with plaintiff's estimate of $275.

To this gross profit is added the financing income earned on the sale of new Saabs. In 1971 21% of the new cars sold were Saabs. Plaintiff has *assumed* that this same percentage of financing income, amounting to $21,728 for all car lines, could be attributed to the Saab line. No records were checked to determine the percentage of Saabs actually financed. Thus, this estimate will be discounted by 25% for failure to check the relevant records and the court's inability to establish a trend.[9] Financing income per new Saab car is:

$$\frac{.75(21\%) \times \$21,728}{187 \text{ cars}} = \$18$$

The variable expenses to be deducted from the gross profit figure are the floor plan interest, salesman's commissions and advertising expense per car.

The floor plan interest was estimated at $5520 per year for all new Saabs sold. For failure to use available business records, this estimate will be increased 50%. The expense per car is:

$$\frac{1.5(\$5520)}{187 \text{ cars}} = \$44$$

Plaintiff's witnesses testified that salesmen's commissions on the sale of new cars was 20% of gross profit plus $15. The commission expense is:

$$.20(\$271) + \$15 = \$69$$

The uncontradicted evidence showed that prior to 1972 Saab paid Martin Motors $250 per car in advertising subsidies. These were legally terminated in 1972 requiring Martin Motors to then assume this expense.

---

**7.** All figures used in the calculations will be rounded up or down to the nearest dollar in light of the admittedly rough nature of these calculations.

**8.** The average gross profit is calculated by dividing the gross profit attributable to the sale of new Saabs by the number of Saabs sold.

Where the financial statements and plaintiff's exhibit (inexplicably) conflict, the lower average gross profit is used.

**9.** Some records were destroyed or missing at the time of the suit. They were, or should have been available when the suit was filed in December 1972.

Thus the advertising expense per car required to maintain the sales trend of new Saab cars is $250.

In sum, the profit lost on each of 187 new cars is the following:

| | | |
|---|---|---|
| Expected gross profit | | $271 |
| Plus: financing income per car of $18 | | 289 |
| Less expenses: floor plan | | |
| interest | 44 | |
| salesmen's commission | 69 | |
| advertising | 250 | |
| | 363 | (74) |

These calculations indicate that Martin Motors did not lose any gross profits from the sale of new Saabs due to defendant's unlawful termination.[10]

### Gross Profits Lost on Used Cars for the First Year

The lost profits on used cars associated with the Saab franchise is the expected number of used cars that would have been sold the next year multiplied by the expected gross profit less the variable expenses associated with the sale.

In 1971 plaintiff received 48 used cars in trade on the sale of 226 Saabs. Of this number, plaintiff estimated that 17 of these cars would have been junked leaving 31 used cars for resale. Thus the salable used cars was 14% of the number of new cars sold. This percentage must be discounted 25% because it is based on a single year and not on a series of years in order to establish a trend. Based on estimated sales of 187 new Saabs, plaintiff would have sold the following number of used automobiles:

$$.75(14\%) \times 187 = 20 \, [11]$$

The average gross profit on the sale of all used cars between 1967 and 1971 inclusive was $258, $298, $426, $499 and $321.[12] Although the trend was upward, there was a drop the last year, so an average of the last three years will be used, or $415. This roughly accords with plaintiff's estimate of $450 per car.

From this sum must be deducted salesmen's commissions. Plaintiff has presented no records from which these can be calculated accurately.[13] On the assumption that the commission on used cars is the same as that on new cars, the commission per car is:

$$.20(\$415) + \$15 = \$98$$

The court finds that policy work expenses, i. e., free customer service after a sale, are compensated by the profit made on repair work and need not be deducted. Reconditioning expenses have already been considered in arriving at the $415 figure. There has been no proof that the cars are sold with warranties, thus there need be no deduction for warranty expenses.

The profits lost on the sale of used cars for the first year is computed as follows:

$$(\$415-\$98) \times 20 = \$6,340$$

The calculation cannot end here, however, because plaintiff's witness, Lester Shaen, then sales manager of Martin Motors, testified that after the Saab franchise was terminated, the number of used car salesmen was reduced by three persons. Transcript at 999. Shaen also testified that new car salesmen and, presumably used car salesmen, were paid a base salary in addition to commissions. Transcript at 1001. There is

---

**10.** This "loss" will not be carried forward to lower the lost gross profit on other aspects of the business. The ($74) figure does not purport to be an accurate reflection of the contribution of new Saabs to Martin Motors. Rather, that figure was reached by deliberately discounting plaintiff's estimates in order to arrive at an understated gross profit figure.

**11.** In 1971 plaintiff sold 19 used Saabs. Plaintiff asserts that the sale of used Saabs suffered when the franchise ended because a new car franchise attracts buyers of that make used car. Though that may be true, no figures were used to show any decrease in the sale of used Saabs, though the suit was tried four and one half years after termination. After termina-

tion, plaintiff was still free to buy and sell used Saabs. The court will not speculate on the extent of the loss of plaintiff's used Saab business, but will assume that Martin Motors continued to sell used Saabs.

**12.** This is calculated by dividing total used car gross profits by the number of used cars sold as shown on the financia! statements.

**13.** Plaintiff's financial statements for 1967 through 1970 show a range of salesmen's commissions (total used cars plus new cars divided into "commissions—salesmen") of between $2.76 and $6.44.

no information on which the court can determine the savings in expenses related to the loss of three salesmen. The court will not speculate as to the appropriate sum and must assume that the loss gross profit of $6,340 was offset by the savings from the reduction of the sales force.

The lost gross profit from used car sales is zero.

## Gross Profit Lost on Parts Sales for the First Year

The lost profit on the sale of parts may be computed by subtracting the cost of the parts sold from the total sales. An alternate method is to calculate the profit earned by applying the profit rate earned on the sale of parts to the cost of the parts which are sold. This latter method will be used because of the particular data which is available. The parts include those parts used in warranty work, those used in regular repair work, and those sold over the counter both retail and wholesale.

In 1971 $44,024 worth of Saab parts was purchased. Of this sum, $9,522 was used for warranty claims leaving $34,502 in parts. Plaintiff assumed that all those parts which were bought were also sold. Although records existed showing opening and closing inventories, these were not consulted. Therefore, discounting this figure 50% gives $17,251. The amount of parts sold in 1971 may be approximated by another method. Plaintiff's Exhibits 61 and 62 list the sale of parts related to repair work and the over-the-counter sale of parts for certain months of that year. Exhibit 61 shows that $2,832 worth of repair parts were sold during a 101 day period. Extrapolated to 365· days, the parts sold would equal $10,234. Exhibit 62 indicates three months of over-the-counter sales which cost

$3,044, which is an annual rate of $12,176. The total sum is $22,410. This figure should be discounted by 25% because the figures and extrapolation are not entirely reliable, and no trend has been established.

This method of computation yields the following cost of parts sold:

.75($22,410) = $16,808

Since this is the lower figure, it will be used as the cost of certain parts which would have been sold the year following termination.

In 1971 an additional $5,368 worth of parts were bought for Saab automobiles. This figure is discounted 50% since there was no proof that this full amount of parts was sold that year. The resulting figure is $2,684 which, when added to $16,808 equals $19,492.

The profit rate on these parts is 45%. Thus the profit which would have been earned on $19,492 is:

$$\frac{.45}{.55} \times \$19,492 = \$15,948 \text{ [14]}$$

In 1972 $14,780 worth of additives were bought. That figure is likewise discounted 50% to $7,390 because there is no proof that the full amount was all sold that year. Between 1967 and 1971 the percentage of new Saabs sold in relation to all other new cars was 6%, 12%, 18%, 17% and 21%.[15] Averaging the last three representative years gives 19% per year. The court thus assumes that 19% of the additives were used for Saabs. There is no documentary evidence as to the profit earned on additives. Plaintiff assumes that it is 45%. That will be discounted 50% to 22.5%. The profit lost on the sale of additives is:

$$.5(\$14,780) \times .19 \times \frac{.225}{.775} = \$408$$

---

**14.** A profit rate of 45% means that 45% of the selling price is the profit. Thus if X equals the profit to be earned on $19,492, and the profit rate is 45%, this may be shown algebraically as follows:

$$X = .45(X \times \$19,492)$$
$$X = .45X + .45(\$19,492)$$
$$X - .45X = .45(\$19,492)$$
$$.55X = .45 (\$19,492)$$
$$X = \frac{.45}{.55} \times \$19,492$$

It can be shown that this equation may be generalized to find the profit given the cost and the profit rate. If the profit rate is r and the cost is C, then the profit, P, is:

$$P = \frac{r}{1-r} \times C$$

**15.** Plaintiff's assertion that 30% of the additives were used for Saabs is supported by no data.

In 1971 or 1972 $11,470 worth of oil was purchased. That amount is discounted 50% and of that figure 19% is allocated to Saab repairs. The profit claimed is 30%, but since there is no proof as to that figure, the profit will be assumed to be 15%. Thus the lost profit is:

$$.5(\$11,470) \times .19 \times \frac{.15}{.85} = \$192$$

Similarly, $1,386 worth of Saab tires were bought in 1971 or 1972. Discounted 50%, that figure is reduced to $693. The profit is estimated at 25%, which must be halved for failure to document this figure. The resulting profit is:

$$.5(\$1,386) \times \frac{.125}{.875} = \$99$$

Parts profits earned on warranty work in 1971 equaled $1,707 based on the sale of 226 new Saabs. Based on the estimated sale of 187 new Saabs, that figure is reduced to:

$$\frac{187}{226} \times \$1,707 = \$1,412$$

The total amount of expected gross profits lost on the sale of parts for the year after termination is:

| | |
|---|---|
| parts at 45% profit | $15,948 |
| profit on additives | 408 |
| profit on oil | 192 |
| profit on tires | 99 |
| profit on warranty work | 1,412 |
| | $18,059 |

The court finds that there are no significant variable costs which should be deducted from this final figure.

Plaintiff would add 50% to this figure claiming that sales of Saab parts was expected to rise 50% the next year. The only support for this contention offered by plaintiff was that by moving into the spacious 11th Avenue facility both Martin Motors and Saab-America expected repair work to increase substantially. The hard evidence available to the court, i. e., the financial statements of Martin Motors for the years 1971, 1972, 1973 and 1974 suggests that after the loss of Saab the business of Martin Motors went into a general slump which was not solely connected with the loss of the Saab franchise.

From 1971 to 1973 the gross sales of Martin Motors decreased from $7.6 million to $5.7 million. Sales registered a modest rise to $5.8 million in 1974. The decline of $1.9 million represented a 25% decline in sales. This full loss is not due to the loss of Saab. The figures indicate that from 1968 through 1971 Saab's percentage of new car gross sales rose continuously from 8.6% to 16.5% of new car gross sales as a whole. On the reasonable assumption that Saab's contribution to the new car aspect of Martin Motors was comparable to its contribution to the entire business of Martin Motors, the 25% decline in sales from 1971 to 1973 is not solely explained by the loss of Saab.

The sales of parts also shows a similar trend downward. Gross sales were $832,000 in 1971, $897,000 in 1972—the year in which only 55 Saabs were sold—$670,000 in 1973 and $692,000 in 1974. The decline from 1972 to 1973 was 25%. There are no specific figures as to the gross sales of Saab parts over the years. The evidence is clear that Martin Motors did not thrive after it moved to 11th Avenue. Rather its business stagnated and declined slightly even after the loss of Saab had been accounted for. Martin Motors' claim that the profit on parts sales would have increased 50% in years following the move to 11th Avenue is contrary to the evidence.

### Lost Profits on Labor for the First Year

From 1967 to 1970 inclusive, the ratio of gross profits on service to gross profits on parts was 1.69, 1.26, .98 and 1.18.[16] The ratio cannot be computed from the 1971

---

**16.** The data is from the financial statements. Gross profits for service is the sum of gross profits for mechanical and body labor. Gross profits for parts includes the total gross profits on parts less gross profit on warranty parts and internal parts. It is proper to link the

financial statement,[17] and will be assumed to be 75% of the low 1969 ratio of .98, or .74. The average of the last four years is thus 1.04. The lost profits on labor for the first year which can be attributed to the loss of the Saab franchise is thus:

1.04($18,059) = $18,781

The court finds that there are no variable costs which should be deducted from this profit figure.

Loss of Net Profit After the First Year

Based on plaintiff's financial statements for the years 1967 through 1971 inclusive, plaintiff's gross profit on new Saab sales was the following percentage of gross profits on all new car sales: 2%, 7%, 15%, 14% and 11%. On the reasonable assumption that plaintiff's overall net profit related to the Saab line is directly proportional to Saab's percentage of new car sales, the product of the above percentages and Martin Motors' net profit for 1968 through 1971 is the following: $574, $1,604, $2,418, $950 and $1,124. Eliminating the anamolous 1967 figures the average of the last four years, or $1,524, is assumed to be Martin Motor's expected net profits on the sale of Saabs over the future lifetime of the franchise.[18]

However, the calculation cannot end here because beginning in 1972 the subsidies from Saab came to an end. These annual subsidies were estimated to range between $35,000 to $85,000 over the years. Much of this amount went to pay for Saab advertising, which has already been factored into this damage equation, but even at $250 per car for 200 cars (an amount of sales only exceeded in 1971), the advertising subsidy amounted to $50,000. The subsidies included other items such as bonuses on the sale of new cars, representatives sent from the factory to help service Saabs, forwarding of

customers to Martin Motors, training of Martin Motors' personnel and other items. There is no proof that these subsidies have already been considered in the above calculation, so the court must assume that, with the cutoff of these subsidies in 1972, the estimated net profit of $1,524 which could have been attributed to Saab would have been wiped out.[19] The estimated future net profits are, therefore, zero.

Cost of the Suit

■ If a plaintiff prevails under the Act, he "shall recover the damages by him sustained and the cost of suit . . . ." 15 U.S.C. § 1222. Martin Motors claims that "cost of suit" includes reasonable attorney's fees, although it cites no cases in support of this interpretation.

The legislative history of the Act indicates that Section 1222 does not include attorney's fees.

The Committee had deleted the right to a reasonable attorney's fee as an element of damages. Under the amended bill, the dealer would be limited to recovery of damages sustained and the cost of suit.

H. R. Rep. No. 2850, 84th Cong., 1st Sess., reprinted in [1956] U.S.Code Cong. and Admin.News 4596, 4602. The court has not located a single case in which attorney's fees were awarded under the Act. Since the Act does not include an award of attorney's fees, the request for them is denied.

*Summary*

The following is awarded as compensation for the gross profits lost the first year after termination:

| | |
|---|---:|
| gross profit lost on new cars | $ 0 |
| gross profit lost on used cars | 0 |
| gross profit lost on parts | 18,059 |
| gross profit lost on service | 18,781 |
| | $36,840 |

profits for one aspect of a business with the proven profits of another aspect. *Autowest, supra*, 434 F.2d at 567.

17. Certain data for the crucial years of 1971 and 1972 is missing although it is supplied for prior and subsequent years.

18. Plaintiff does not account for inflation. Nor will the court.

19. There is evidence that Saab offered rebates to its dealers in 1972. It is too speculative to assume that these rebates would compensate Martin Motors for the subsidies which it had lost, since neither the amount nor duration of these 1972 subsidies has been proven.

There is no award for the loss of future net profits. Submit order on notice.