SCUNCIO MOTORS, INC.

v.

SUBARU OF NEW ENGLAND, INC.

Civ. A. No. 82–0716.

United States District Court,
D. Rhode Island.

Dec. 20, 1982.

Hale & Dorr, Robert W. Mahoney, Donald R. Frederico, Boston, Mass., Vetter & White, George M. Vetter, Jr., Providence, R.I., for defendant.

Letts, Quinn & Licht, Frank Licht, Providence, R.I., for plaintiff.

## OPINION

SELYA, District Judge.

Plaintiff, Scuncio Motors, Inc. ("Scuncio") is an automobile dealer, retailing Subaru automobiles since 1972, and defendant Subaru of New England, Inc. ("SNE") is a distributor for the manufacturer of Subaru vehicles. They have been parties to a series of dealership agreements, the latest of which I will call "the Agreement," which will be described hereinafter in greater detail. Scuncio admits that it failed to comply with certain provisions of the Agreement. In consequence of such noncompliance, SNE informed Scuncio, by letter dated August 25, 1982 (the "Termination Letter") that SNE would "terminate and cancel" the Agreement, effective December 1, 1982.

On October 26, 1982, Scuncio filed suit in the Superior Court for the County of Providence, seeking, among other things, to enjoin SNE from terminating the Agreement and to have portions of the Agreement declared void and unenforceable under the "Act Relating to Motor Vehicle Manufacturers and Dealers," Rhode Island General Laws, § 31–5.1–1 *et seq.* (1956), as amended (the "Dealers' Law"). SNE properly removed the action to this Court pursuant to the provisions of 28 U.S.C., § 1441(a). Scuncio's motion to remand was argued and denied on November 12, 1982. Scuncio's motion for a temporary restraining order was consolidated for hearing with the complaint's prayers for preliminary injunction, and a hearing was held in this Court on November 29, 1982.[1]

Jurisdiction is based on 28 U.S.C., § 1332. The Court, sitting in diversity jurisdiction, must apply the substantive law of Rhode Island. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed. 62 (1978). The Rhode Island Supreme Court has not yet, however, had occasion to pass upon or to interpret the Dealers' Law.[2] Thus, it becomes this Court's obligation to make an informed prophecy as to the meaning and effect of that statute. *Erie Railroad Co. v. Tompkins, supra; Nature Conservancy v. Machipongo Club, Inc.,* 579 F.2d 873, 875 (4th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); *Sealey v. Ford Motor Co.,* 499 F.Supp. 475, 478 (E.D.N.C.1980); *Skrzat v. Ford Motor Co.,* 389 F.Supp. 753, 754 (D.R.I.1975); *Oresman v. G.D. Searle & Co.,* 321 F.Supp. 449, 456 (D.R.I.1971).

### I. *The Preliminary Injunction Standard*

In order to obtain a preliminary injunction, plaintiff must satisfy four criteria:

> The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979).[3] All four of these criteria are important. In the First Circuit, however, the third component, the likelihood of success on the merits, has been described as "a prerequisite to the granting of preliminary injunctive relief." *Local Div. 589, Amalgamated Transit Union v. Commonwealth of Massachusetts,* 666 F.2d 618, 645 (1st Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). If there is a close factual dispute which could go either way at a trial on the merits, a court

---

1. SNE agreed, at the urging of the Court, that it would not act upon, nor attempt to enforce, the Termination Letter pending the issuance of an expedited ruling on Scuncio's prayers for a preliminary injunction.

2. The time constraints implicit in the threatened termination and in the ensuing thrust for injunctive relief rendered impractical, at this stage of the litigation, certification of questions to the R.I. Supreme Court pursuant to Rule 6 of that tribunal's rules of appellate procedure.

3. At the preliminary injunction hearing, plaintiff argued that the defendant had the burden of showing likelihood of success on the merits because, under the Dealers' Law, the defendant has the burden of proving that it terminated the franchise for good cause and in good faith. R.I.G.L. § 31–5.1–4(D)(3). Plaintiff's argument must be rejected. First, subsection (D)(3) applies only to subdivision 5.1–4(D) of the Dealers' Law, which governs manufacturer termination of a franchise, and plaintiff claims violations of other sanctions of the Dealers' Law as well. Moreover, while the defendant may carry the likelihood of success on the merits, the law is clear that plaintiff must carry the overall burden for obtaining a preliminary injunction. *E.g., Planned Parenthood League v. Bellotti,* 541 F.2d at 1009.

should be reluctant to issue an injunction pendente lite. *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir.1978).

In the present case, plaintiff has palpably met three of the four prerequisites for preliminary injunctive relief.

■ Plaintiff, as a one-brand dealer, will doubtless be forced out of business if the injunction is denied, thus making irreparable injury manifest. Second, this potential harm to plaintiff substantially outweighs, in the Court's view, any reasonably likely harm to the defendant (a conclusion which defendant does not seriously challenge). Third, granting the injunction will cause no discernible effect on the public interest. The "likelihood of success" criterion is, therefore, the fulcrum on which this ruling must turn.

## II. *Likelihood of Success on the Merits*

Plaintiff argues that its likelihood of success on the merits is assured for a number of reasons. Plaintiff contends, first, that the proposed termination violates a 1982 amendment to the Dealers' Law, which limits the freedom of a manufacturer or agent, such as SNE, to require dealers, such as plaintiff, to expand their facilities. R.I. G.L. § 31–5.1–4(c)(19) (1982 Amendment). The plaintiff further argues that the defendant's conduct in attempting to terminate plaintiff's dealership is illegal under other sections of the Dealers' Law, because such conduct is and has been arbitrary, in bad faith, unconscionable, coercive and predatory. *Id.* at § 31–5.1–4(A), (B) and (C)(17). These contentions must be examined separately.

## A. *The 1982 Amendment*

The 1982 amendment to the Dealers' Law makes it unlawful for a "manufacturer or officer, agent or other representative thereof":

> To require that a dealer expand facilities without a guaranty of sufficient supply of new motor vehicles to justify such an expansion or to require that a dealer expand facilities to a greater degree than is necessary to sell and service the number of vehicles that said dealer sold and serviced in the most recent calendar year.

*Id.* at § 31–5.1–4(C)(19) (1982 Amendment).[4]

The applicability of this amendment to the case at bar must be determined against the factual backdrop of the particular franchise relationship. The resultant facts must then be analyzed from both chronological and legal perspectives in this case.

### 1. *The Refranchising Negotiations*

Joseph Scuncio, Jr. is the principal of Scuncio. Mr. Scuncio testified that as early as 1974, SNE representatives occasionally discussed with him the advisability of expanding or of relocating his Subaru dealership to a larger facility. Deposition of Joseph Scuncio, Jr., taken November 18, 1982 ("Scuncio Deposition") at 7–8. He admitted that the relocation of his dealership would have been desirable because he would then have received more cars to sell, *id.* at 18–19, and would have been able to expand his parts department. Indeed, between 1974 and 1980, Mr. Scuncio made three attempts to find another site for his dealership; he discussed some of these possibilities with

---

4. The term "manufacturer" as defined by R.I. G.L. § 31–5.1–1 encompasses a distributor such as SNE. The definition of "manufacturer" in material part provides:

"Manufacturer" means any person, partnership, firm, association, corporation or trust, resident or nonresident, who manufactures or assembles new motor vehicles, or imports for distribution through distributors of motor vehicles, or any partnership, firm, association, joint venture, corporation or trust, resident or nonresident, which is controlled by the manufacturer.

Additionally, the term manufacturer shall include the following terms: (1) "Distributor" means any person, firm, association, corporation of trust, resident or nonresident, who in whole or in part offers for sale, sells or distributes any new motor vehicles to new motor vehicle dealers or who maintains factory representatives or who controls any person, firm, association, corporation or trust, resident or nonresident, who in whole or in part offers for sale, sells or distributes any new motor vehicle to new motor vehicle dealers. R.I.G.L. § 31–5.1–1(B).

SNE.[5] Thus, it could have come as no surprise to Mr. Scuncio to learn that, on the agenda for discussion in the negotiations with SNE for a renewal of his dealership agreement, was the issue of site relocation.

The negotiations regarding the new dealership agreement began in May, 1981,[6] when Mr. H.J. Burbank, the Vice-President of Marketing for SNE, sent Scuncio a letter, dated May 29, 1981, enclosing a Subaru Dealership Agreement, a Subaru Dealership Agreement and Standard Provisions Booklet, a set of Regional Dealership Minimum Standards for Capital, Inventory, Facilities and Personnel, and a Dealer Profile comparing Scuncio to the Regional Dealership Minimum Standards. Letter, dated May 29, 1981, from H.J. Burbank to Mr. Joseph Scuncio ("Defendant's Exhibit I").

The Dealer Profile indicated that, according to SNE standards applicable to a dealership of Scuncio's size, the site on which the Scuncio dealership was located was deficient in that it contained only 11,450 square feet, compared to the 43,500 square feet required by SNE. Scuncio's first floor parts department contained only 351 square feet, compared to applicable SNE standards of 1,000 square feet. SNE standards provided for 37 parts bins and racks, yet Scuncio had only 6. Scuncio did not have a Subaru accessory display case, whereas the standards mandated one. Scuncio had only

one mechanical lift; SNE standards call for two. Scuncio had only 70 square feet for office space; SNE standards provided for 359 square feet. Scuncio did not have three of the four signs specified by SNE standards. Scuncio's personnel complement fell short of SNE standards in at least three respects. Dealer Profile, Exhibit A to affidavit of Richard S. Joyce, Sr., dated November 23, 1982 ("Joyce Affidavit").[7]

The May 29, 1981 letter informed Scuncio that the Dealer Profile would be the key document used during refranchising negotiations and advised Scuncio to verify the accuracy of its contents. Defendant's Exhibit I. Within the next one and a half months, SNE sent Scuncio four letters reminding the plaintiff of the importance of the Dealer Profile and of the upcoming refranchising meeting. One of the letters, Defendant's Exhibit K, stressed the importance of raising any questions regarding the Dealer Profile with the SNE District Sales Manager.[8] Mr. Scuncio forwarded the documents to his counsel. Scuncio Deposition at 50. Mr. Scuncio signed the Dealer Profile without raising the slightest question as to the accuracy of its contents. Id. at 45–46.

The refranchising meeting between Scuncio and SNE took place on July 24, 1981. Scuncio was represented by counsel. Id. at 49–50; Joyce Affidavit at Para. 6. At the

---

**5.** Mr. Scuncio testified that sometime around 1976, he considered moving to a site on Tower Hill Road which would have been "absolutely perfect," Scuncio Deposition at 97, but that the property was sold to a third party before he was able to negotiate for its acquisition. Id. at 101–02. In 1979 or 1980, Scuncio considered relocating to a site which had been used as a Goodyear tire store, without comparing the site against the SNE dealership standards. Id. at 22, 24, 28. Although Mr. Scuncio discussed the site with a representative of the owner several times, nothing concrete resulted from those discussions. Mr. Scuncio also discussed this site with SNE representatives, who told him he would need to do some work on the property to bring it up to SNE standards. Id. at 23. Mr. Scuncio also looked at a Lincoln-Mercury facility in Wakefield, Rhode Island as a possible site, but did not pursue the property after he was informed that the owner preferred to lease rather than to sell. Id. at 15–16.

**6.** Scuncio's then-extant Subaru Dealership Agreement was to expire on September 30, 1981. Letter, dated June 26, 1981, from H.J. Burbank to Mr. Joseph Scuncio ("Defendant's Exhibit K").

**7.** According to Richard Joyce, Sr., president and general manager of SNE, SNE had discussed these deficiencies in Scuncio's dealership with Mr. Scuncio for several years prior to the summer of 1981. Joyce Afficavit at Para. 3.

**8.** Letter, dated June 8, 1981, from H.J. Burbank to Joseph Scuncio ("Defendant's Exhibit J"); Defendant's Exhibit K; Letter, dated July 2, 1981, from H.J. Burbank to Joseph Scuncio ("Defendant's Exhibit L"); Letter, dated July 7, 1981, from Joseph M. Thome to Joseph Scuncio ("Defendant's Exhibit M").

meeting, SNE and Scuncio discussed Scuncio's overall operations to assist Scuncio in improving its financial position. Scuncio Deposition at 52–53. The need for Scuncio to relocate to a larger facility was also discussed, and neither Mr. Scuncio nor his attorney questioned the advisability of relocation, nor did they inform SNE that Scuncio did not wish to relocate. *Id.* at 62, 112. At Scuncio's request, SNE agreed that Scuncio could relocate not only in its own dealer's area,[9] but also to Newport, in which event it would be given a new dealer's area. *Id.* at 56–57. Mr. Scuncio asked SNE to remove the Town of Westerly from plaintiff's dealer's area, and to add the Town of Narragansett; SNE did so. *Id.* at 54–56. At Mr. Scuncio's request, SNE further agreed to extend by several months the dates by which Scuncio was to accomplish the various stages of relocation. Stipulation of counsel, contained in Scuncio Deposition at 63–64. SNE told the plaintiff at the refranchising meeting that it would reconsider the Goodyear site, so-called, if the Lincoln-Mercury site, so-called, was still unavailable. Scuncio Deposition at 68–76.[10]

SNE sent Scuncio the revised Agreement on July 28, 1981. *Id.* at 57; Letter dated 7/28/81, from H.J. Burbank to Joseph Scuncio ("Defendant's Exhibit N"). Mr. Scuncio reviewed the Agreement in its entirety with counsel, and asked SNE to delete a clause acknowledging the inadequacy of Scuncio's facilities, which SNE agreed to do. Scuncio Deposition at 67–68. Scuncio then signed the Agreement and returned it to SNE. *Id.* at 68. During negotiations on

Scuncio's refranchising, SNE agreed with every revision of the Agreement requested by Scuncio. *Id.* at 155.

Scuncio admitted that it did not comply with the provisions of the Agreement requiring that SNE be notified by June 1, 1982 of the proposed site relocation. *Id.* at 113. Neither did plaintiff request an extension of the deadlines for notification and relocation, despite a provision in the Agreement providing for the possibility of an extension upon reasonable request. *Id.* at 93. Accordingly, on August 25, 1982, SNE forwarded to Scuncio the Termination Letter. The Termination Letter recapitulated the perceived shortcomings of Scuncio's operation, the derogation of SNE standards, and the history of the refranchising negotiations. SNE informed Scuncio therein that its failure to meet the standards and to comply with the relocation provisions of the Agreement constituted material breaches of the Agreement and furnished good cause for canceling and terminating the Agreement. Exhibit C to Joyce Affidavit.[11] Mr. Scuncio testified that he considered the contents of the letter to be "fairly close" to accurate, and never told SNE that any of the factual information was wrong. Scuncio Deposition at 107.

### 2. *The Application of the 1982 Amendment to the Agreement*

The 1982 amendment to the Dealers' Law states in substance that it shall be "unlawful" for an agent of a manufacturer "to require" a dealer to expand facilities with-

---

**9.** Scuncio's "Dealer's Area," at the close of negotiations regarding the Agreement, consisted of the following areas in Rhode Island: Ashaway, Bradford, Carolina, Charlestown, Escoheag, Hope Valley, Hopkinton, Kenyon, Kingston, Narragansett, Peacedale, Shannock, South Kingston, Wakefield, West Kingston, Wood Road Junction and Wyoming. Subaru Dealership Agreement, Exhibit B to Joyce Affidavit.

**10.** *See* note 5, *supra.*

**11.** The Termination Letter also stated:
Further, on May 28, 1982, you advised Doug Fohlin, our District Sales Manager, that you had absolutely no intention of complying with the provisions of your Agreement pur-

suant to which you committed to relocate your Subaru dealership operation. Your blatant disregard for the obligations you negotiated and undertook pursuant to your Subaru Dealership Agreement and your announced intention not to comply with those provisions constitute bad faith conduct as that term is defined in Rhode Island Statute § 31–5.1–1(H). Your bad faith conduct constitutes a violation of Rhode Island Statute § 31–5.1–4(A) and provides a separate and additional basis of good cause for the termination and cancellation of your Subaru Dealership Agreement.
Exhibit C to Joyce Affidavit at 3.

out guaranteeing a sufficient supply of vehicles to justify expansion or to expand facilities to a greater degree than is necessary to sell and service the number of vehicles the dealer sold and serviced in the most recent calendar year. R.I.G.L. § 31–5.1–4(C) (1982 Amendment). The Court finds it impossible to apply this recent enactment to the present case for two reasons.[12]

First, the statute, by its terms, applies only to situations in which an agent of a manufacturer, such as SNE, "require(s)" a dealer to expand facilities. The verb "to require" usually implies something mandatory, not something which has been negotiated. As Justice Blackmun recognized when writing for the United States Court of Appeals for the Eighth Circuit, in *Mississippi River Fuel Corp. v. Slayton,* 359 F.2d 106, 119 (8th Cir.1966), *rev'd on other grounds, sub nom. Levin v. Mississippi River Fuel Corp.,* 386 U.S. 162, 87 S.Ct. 927, 17 L.Ed.2d 834 (1967), it suggests the authority and duty to impose sanctions for noncompliance, and is not satisfied by a mere request. *United States v. John Henricks, Inc.,* 388 F.2d 677, 679 (7th Cir.1968).[13]

■ In the instant case, SNE did not simply impose on Scuncio a mandatory obligation to expand its facilities through relocation. Rather, SNE and Scuncio negotiated the Agreement, which included terms regarding relocation. The evidence shows, and the Court finds, that Scuncio fully understood the terms and implications of the proposed Agreement, was represented by competent counsel throughout the renegotiation sessions, and was not subjected to coercion or duress beyond that which might in all events be implied from the relative bargaining positions of the parties. The Court further finds that Scuncio successfully contested several provisions in the original SNE proposal; and that SNE, in fact, acceded to each of the plaintiff's demands

in the negotiating process. Scuncio did not, however, attempt to bargain away, or even to question, the proposed terms regarding relocation, other than to ask that the dates for relocation be extended. Nothing in the record suggests that it would have been useless for Scuncio to challenge the application of SNE standards to its facility, nor is there anything indicating that SNE was at that time unwilling to negotiate the proposed relocation. From the foregoing facts, the Court concludes that Scuncio knowingly entered into the Agreement, and consented to the terms of the Agreement regarding relocation. Thus, it becomes difficult to conclude that Scuncio was "require(d)" to expand its facilities within the meaning of the statute.

Moreover, if the legislature had meant to include within the scope of the 1982 amendment "requirements" theretofore negotiated by the parties as a term of a franchise agreement, such as this Agreement, it would have so stated. For example, in Subsections 31–5.1–4(D)(1), (2) and (4)(a) of The Dealers' Law, the Rhode Island General Assembly made it clear that a dealer and manufacturer could not negotiate away certain rights by using language such as "(n)otwithstanding the terms, provisions or conditions of any franchise." Had the General Assembly included such a phrase in the 1982 amendment, the Court would be more inclined to conclude that it was intended to apply to the Agreement. By not explicitly stating that the 1982 amendment applied "notwithstanding" agreements to the contrary, when it did so state in several other provisions of the same statute, *e.g.,* §§ 31–5, 1–4(D)(1), (2) and (4)(a); 31–5.1–9; 31–5.–1–18(a), the Court can only infer that the General Assembly made a conscious decision that the amendment should not apply to negotiated bilateral agreements. *Coopers & Lybrand v. Board of Accountancy,* 448

---

12. Scuncio's 1982 sales, as of October, 1982, totaled 90 cars. Defendant's Exhibit F. Because the Court bases its holding on other aspects of the 1982 amendment, the Court finds it unnecessary to determine whether Scuncio's present facilities are sufficient for annual processing of this number of vehicles.

13. Black's Law Dictionary defines the verb "require" as: "(t)o direct, order, demand, instruct, command, claim, compel, request, need, exact." *Black's Law Dictionary* 1468 (rev. 4th ed. 1968).

A.2d 1225, 1226 n. 2 (R.I.1982); *State v. Feng,* 421 A.2d 1258, 1264 (R.I.1980); *A.A. Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.,* 395 A.2d 724, 726 (R.I. 1978); *Coastal Finance Corp. v. Coastal Finance Corp. of North Providence,* 387 A.2d 1373, 1378 (R.I.1978).

■ Regardless of whether Scuncio was required, within the meaning of the statute, to expand its facilities, the Court concludes that the 1982 amendment does not, in any event, apply to the present situation, for a second reason. The Agreement at issue was negotiated and signed during the spring and summer of 1981. The statutory amendment was adopted by the Rhode Island General Assembly during its 1982 session. To apply the amendment to this case would be to sanction the retroactive application of statutes, something this Court is loathe to do without clear guidance from the legislature as to its intent to give the statute retroactive force and effect. *State v. Healy,* 410 A.2d 432, 434 (R.I.1980); *State v. Mulholland;* 117 R.I. 321, 366 A.2d 153, 154 (1976); *Fox v. Fox,* 115 R.I. 593, 350 A.2d 602, 603–4 (R.I.1976); *Norton v. Paolino,* 113 R.I. 728, 327 A.2d 275, 279 (1974); *Woonsocket Hospital v. Lagace,* 113 R.I. 95, 318 A.2d 472, 477 (1974).

Scuncio argues that because the 1982 amendment was to become effective upon passage, it must follow, as the night the day, that the General Assembly desired to enswathe previously executed agreements and stipulations within the blanket effect of the new law. The sockdolager to this contention, however, is a decisive one; the Rhode Island Supreme Court, itself, has flatly rejected just such an argument. *Opinion to the Governor,* 91 R.I. 187, 162 A.2d 814, 815–16 (1960). Indeed, in *Norton v. Paolino,* 327 A.2d at 278–79, the Rhode Island Supreme Court has expressly affirmed a trial justice's conclusion that, because an amendment was to become operative on the date of passage, the amendment was to be construed as prospective only. *Id.*

When the 1982 amendment is compared with the provisions of the Dealers' Law, it is clear that if the legislature had intended the amendment to apply retroactively, it would have stated as much. For example, in other sections of the law the phrase "notwithstanding the terms, provisions or conditions of any agreement of franchise" has been used. *E.g.,* R.I.G.L. § 31–5.1–18(a) and (b). By including this clause, the General Assembly explicitly indicated its intent that these provisions were to apply regardless of existing franchise agreements. *See also* R.I.G.L. §§ 31–5.1–4(D)(1), (2), (4); 31–5.1–9. As previously indicated, the General Assembly included no such phrase in the 1982 amendment. Because the legislature can be presumed to know the law in effect at the time this amendment was passed, *State v. Healy,* 410 A.2d at 435, its silence on retrospective application is strong evidence of prospective intent, given the long line of Rhode Island cases regarding the presumption against retroactivity. *Id.* at 434 and cases cited at 13 *supra.*

Even absent express language, the amendment could still be given retroactive effect if it fell within the exception to the rule expressed in *Langdeau v. Narragansett Insurance Co.,* 96 R.I. 276, 191 A.2d 28, 31 (1963). There, the Rhode Island Supreme Court, citing *Grinnell v. Marine Guano & Oil Co.,* 13 R.I. 135, 136 (1880), stated: "(I)t is not an insuperable objection to a remedial statute that it affects pending suits, if it affects them remedially, and neither violates vested rights nor impairs the obligation of contracts." *Langdeau v. Narragansett Insurance Co.,* 96 R.I. 276, 191 A.2d 28, 31 (1963). The exception also applies to purely procedural laws, which neither enlarge nor impair substantive rights, but prescribe the methods and procedures for enforcing such rights. *Norton v. Paolino,* 327 A.2d at 278; *Romano v. B.B. Greenberg Co.,* 108 R.I. 132, 273 A.2d 315, 317 (1971). The First Circuit has posed the question as: "How drastically have property rights been affected, and particularly, how great is the change viewed in the light of the reasonable expectations of the parties when the contract was first entered into?" *Fornaris v. Ridge Tool Co.,* 423 F.2d 563, 567 (1st

Cir.), *rev'd on other grounds,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970).

■ The 1982 amendment, however, does not fall within the remedial-procedural exception to the presumption against retroactivity. The amendment imposes substantive restrictions on the ability of a manufacturer or agent, such as SNE, to expand the very dealerships which the manufacturer relies on as the instrumentality for selling its wares. Moreover, in the instant case, the amendment would certainly impair vested contract rights. The Agreement was entered into on July 28, 1981, after full negotiations between Scuncio and SNE. Among the most salient of the substantive provisions of the Agreement were the terms regarding relocation. Applying the strictures of the amendment to these terms would alter drastically the ability of the parties to effect the results contemplated by the negotiated agreement. The change would be precipitous when viewed in the light of the parties' reasonable expectations at the time the Agreement was signed. *Fornaris v. Ridge Tool Co.,* 423 F.2d at 567.

■ Given that the retroactive application of this amendment would impair established contract rights stemming from the Agreement, the Court is constrained to interpret the amendment prospectively for yet another reason. To interpret a statute so as to impair vested contract rights would render the statute an unconstitutional interference with contractual obligations. *Garris v. Hanover Insurance Co.,* 630 F.2d 1001, 1006 (4th Cir.1980); *Fornaris v. Ridge Tool Co.,* 423 F.2d at 567; *Superior Motors, Inc. v. Winnebago Industries, Inc.,* 359 F.Supp. 773, 779 (D.S.C.1973). The Court is bound to construe the statute as constitutional if such a construction is at all reasonably possible. *E.g., Members of Jamestown School Committee v. Schmidt,* 405 A.2d 16, 19 (R.I.1979); *State v. Authelet,* 385 A.2d 642, 647 (R.I.1978). Viewing the 1982 amendment in this light necessarily inhibits an interpretation of the same as applicable to this case. *See Opinion to the Governor,* 91 R.I. 187, 162 A.2d 814, 815–16 (1960).

The Contract Clause of the Constitution does not prevent the State from exercise of otherwise legitimate police powers. *Allied Structural Steel Co. v. Spannus,* 438 U.S. 234, 241–42, 98 S.Ct. 2716, 2720–2721, 57 L.Ed. 727 (1978). Nevertheless, the retroactive application of this amendment to preexisting consensual contracts would significantly impair vested contract rights. Such a forceful intrusion is not saved from constitutional infirmity by virtue of any "reasonable conditions that adequately protect the admittedly impaired interests," or because "it is in any event reasonable and necessary to the accomplishment of a discernible public purpose lying within the reach of the State's police power." *Garris v. Hanover Insurance Co.,* 630 F.2d at 1005. *See Allied Structural Steel Co. v. Spannus,* 438 U.S. at 245–50, 98 S.Ct. at 2722–2724.

Applying the 1982 amendment to the Agreement would nullify its express terms and impose on SNE "heavy contractual obligations that it never assumed," *Fornaris v. Ridge Tool Co.,* 423 F.2d at 567, without any provision for gradual applicability or for periods of grace. *Allied Structural Steel Co. v. Spannus,* 438 U.S. at 247, 98 S.Ct. at 2723. Neither would retroactive application provide SNE and Scuncio with any opportunity to renegotiate the Agreement, taking the terms of the amendment into account. *See Garris v. Hanover Insurance Co.,* 630 F.2d at 1007–08.

Nor can retroactive application of the 1982 amendment be saved from constitutional malaise by being "reasonable" vis-a-vis a "discernible public purpose." *Id.* at 1008–09. The predominant thrust of the amendment, from its face, appears to be to safeguard the private interests of certain automobile dealers who do not wish to expand their dealership facilities, rather than to protect any broader societal interest. *Id.* at 1009. Without impugning either the role that automobile dealers serve in our society or the wisdom of the Rhode Island General Assembly, this Court cannot elevate the interests which would ineluctably be protected by the retroactive application of this amendment to the level of importance required to justify its otherwise unconstitu-

tional retroactive application.[14] To hold otherwise would be to make mountains out of what are, at most, hillocks. For the Court to engage in this sort of orogeny would be dedalian at best, and would serve no useful judicial or civic purpose.

Scuncio attempts to circumvent the problems inherent in the application of the 1982 amendment to the 1981 Agreement by arguing that it seeks to employ the statute only in a prospective mode, that is, to apply it to the proposed termination, notice of which was issued after the amendment was enacted. In making this argument, Scuncio relies on *Anderson's Vehicle Sales, Inc. v. OMC-Lincoln*, 93 Mich.App. 404, 287 N.W.2d 247 (1979). There the parties entered into an agreement prior to July 11, 1978, the effective date of Michigan's Automobile Franchise Act. That legislation required sixty days' written notice for the termination of such an agreement. OMC-Lincoln gave notice on July 5, 1978, with termination to occur on August 5, 1978. The Court concluded that there was no retroactivity problem because the termination of the Dealer Agreement occurred subsequent to the effective date of the statute. *Id.* 287 N.W.2d at 248.

*Anderson's* is inapposite to the present situation for several reasons. First, the Michigan statute contained, appropriately positioned, the phrase "notwithstanding the terms, provisions or conditions of a dealer agreement," a phrase which is, as noted above, conspicuously absent from Rhode Island's 1982 amendment. Secondly, the Rhode Island courts define retroactivity in terms of the effect a law would have on vested contractual rights, *State v. Healy*,

410 A.2d at 435; *Langdeau v. Narragansett Insurance Co.*, 191 A.2d at 31, not in terms of when a party happens to assert these rights. The Michigan court, however, adopted the latter definition of retroactivity. *Anderson's Vehicle Sales, Inc. v. OMC-Lincoln*, 287 N.W.2d at 248. Third, the Michigan statute at issue regarded *notice* of termination, which could convincingly be characterized as procedural in nature. The 1982 amendment, in contrast, proscribes manufacturer-imposed requirements for expansion, a vastly more substantive issue.

The great weight of authority supports this Court's conclusion that the retroactive application of the 1982 amendment to the Dealers' Law would constitute an unconstitutional impairment of the obligation of contract. *See e.g., Fornaris v. Ridge Tool Co.*, 423 F.2d at 567; *Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. at 779; *McAleer Buick-Pontiac Co. v. General Motors Corp.*, 95 Ill.App.3d 111, 50 Ill. Dec. 500, 502, 419 N.E.2d 608, 610 (1981), and cases cited therein.[15] Indeed, the Michigan court has been criticized for its retroactive interpretation of the Michigan franchise statute. *Id.*

B. *Alleged Violations of the Dealers' Law*

Plaintiff argues that even if the 1982 amendment to the Dealers' Law is inapplicable to its case, the proposed termination violates several other provisions of the Dealers' Law. More specifically, Scuncio contends that SNE's conduct is arbitrary, in bad faith and unconscionable in violation of Section 31–5.1–4(A); constitutes coercion in violation of Section 31–5.1–4(C)(2); consti-

14. In *Allied Structural Steel Co. v. Spannus*, 438 U.S. at 250, 98 S.Ct. at 2725, the Supreme Court held that a state statute designed to protect employees from the loss of pension benefits in the event their employer terminated the plan or closed down its operations in the State was of too "narrow aim" to justify its application to pension plan agreements in effect prior to the passage of the Act. *Garris v. Hanover Insurance Co.*, 630 F.2d 1001 (4th Cir. 1980), was a case in which the Fourth Circuit refused to allow the retroactive application of a state statute designed to protect certain insur-

ance agents. And in *Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. 773 (D.S.C.1973), the Court refused to apply a South Carolina statute similar to the Dealers' Law to a franchise agreement entered into prior to the passage of the statute.

15. *See also Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), cert. denied, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974), refusing to apply a franchise act retroactively to a contract entered before its effective date, even if the conduct occurred prior to that date.

tutes a predatory practice in violation of Section 31–5.1–4(C)(1); constitutes a termination without good cause and in bad faith in violation of Section 31–5.1–4(D)(1); and constitutes a termination based on plaintiff's failure to meet unreasonable and immaterial requirements in violation of Section 31–5.1–4(D)(2).

Under Rhode Island law, SNE has "the burden of proof for showing that the notice requirements have been complied with, that there was good cause for franchise termination, cancellation or nonrenewal, and that (it) has acted in good faith." *Id.* at § 31–5.1–4(D)(3).

### 1. *The "Good Faith" Standard*

The Dealers' Law defines "good faith" as "honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade as is defined and interpreted in Section 6A–2–103(1)(b)" of the Uniform Commercial Code. *Id.* at 31–5.1–1(H).[16]

■ In construing the meaning of "good faith" under the Dealers' Law, the Court must look to the statute as a whole. *E.g., Narragansett Electric Co. v. Harsch,* 117 R.I. 395, 368 A.2d 1194, 1199 (1977). The subsection of the Dealers' Law mandating good faith in the termination of a franchise, Section 31–5.1–4(D)(1), provides in subparagraph (2):

(2) Notwithstanding the terms, provisions or conditions of any franchise or the terms or provisions of any waiver, good cause shall exist for the purposes of a termination, cancellation or nonrenewal when:

(a) There is a failure by the new motor vehicle dealer to comply with a provision of the franchise which provision is both reasonable and of material significance to the franchise relationship, provided that the dealer has been notified in writing of the failure within one hundred eighty (180) days after the manufacturer first acquired knowledge of such failure.

(b) If the failure by the new motor vehicle dealer, defined in (a) hereinabove, relates to the performance of the new motor vehicle dealer in sales or service, then good cause shall be defined as the failure of the new motor vehicle dealer to comply with reasonable performance criteria established by the manufacturer if the new motor vehicle dealer was apprised by the manufacturer in writing of such failure; and

(i) Said notification stated that notice was provided of failure of performance pursuant to section (a) of this subsection; and

(ii) The new motor vehicle dealer was afforded a reasonable opportunity, for a period of not less than six (6) months, to comply with such criteria; and

(iii) The new motor vehicle dealer did not demonstrate substantial progress towards compliance with the manufacturer's performance criteria during such period.

Thus, it seems clear that if a manufacturer has good cause under the foregoing rubric for terminating a franchise agreement, and follows the provisions of the statute regarding notice, the manufacturer cannot, without more, be held to have acted in bad faith.

■ Moreover, the Dealers' Law recognizes that a manufacturer should have the ability to insist upon compliance with its reasonable standards without subjecting it-

---

**16.** R.I.G.L. § 6A–2–103(1)(b) states: "(g)ood faith in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The Restatement (Second) of Contracts illustrates the concept of good faith by explaining:

Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. *Restatement of Contracts* (Second) § 205 comment d (1979).

self to reflexive accusations of coercion or bad faith, by expressly providing that the prohibitions against coercion shall not apply to instances in which the manufacturer demands compliance with reasonable terms or provisions of the franchise agreement, *id.* at § 31–5.1–4(B)(4),[17] or to notices tendered in good faith for violation of the terms of the franchise agreement. *Id.* at § 31–5.1–4(C)(2).[18]

Under the Dealers' Law, then, if (i) the manufacturer's standards are included in a franchise agreement; (ii) those standards are reasonable and of material significance; and (iii) the manufacturer properly notifies the dealer that the latter is not adhering to the standards and gives the dealer an adequate time to comply, the manufacturer will also, given such a predicate, be acting in good faith (unless its attempts to mandate compliance cross the line of fair dealing and trespass upon prohibited territory in such a manner as to raise the spectre of impermissible coercion or intimidation).

It also seems clear that if the manufacturer complies with the foregoing provisions of the Dealers' Law, it cannot then be held liable, based on the same actions, under either Section 31–5.1–4(A) of the same law, prohibiting conduct which is arbitrary, unconscionable and in bad faith, or Section 31–5.1–4(C)(17), barring predatory activities.

In determining whether "good faith" exists, it is, in the Court's judgment, instructive to review the kindred analysis which has heretofore been applied under the "Automobile Dealer Suits Against Manufacturers Act," 15 U.S.C. 1221 *et seq.* (The "Day-in-Court Act"). *See Warren Brothers Co. v. Cardi Corp.,* 471 F.2d 1304, 1307 (1st Cir.1973). The Day-in-Court Act defines good faith as: "The duty of each party to any franchise, and all officers, employees, or agents thereof, to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party; provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e). Failure to exercise good faith will only be found in situations in which the manufacturer's actions are unfair or inequitable in addition to being coercive or intimidating, *Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901, 911 (9th Cir.), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Randy's Studebaker Sales, Inc., v. Nissan Motor Corp.,* 533 F.2d 510, 514–15 (10th Cir.1976); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 561 (2d Cir.1970); *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437, 442 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). The First Circuit has explained:

Emphasis added.

**17.** R.I.G.L., Section 31–5.1–4(B)(4) provides:

It shall be deemed a violation of this chapter for a manufacturer, or officer, agent or other representative thereof, to coerce, or attempt to coerce, any motor vehicle dealer ... (t)o enter into any agreement with the manufacturer or to do any other act prejudicial to the new motor vehicle dealer by threatening to terminate or cancel a franchise or any contractual agreement existing between the dealer and the manufacturer; *except that this subsection is not intended to preclude the manufacturer or distributor from insisting on compliance with the reasonable terms or provisions of the franchise or other contractual agreement, and notice in good faith to any new motor vehicle dealer of the new dealer's violation of such terms or provisions shall not constitute a violation of the chapter.*

**18.** R.I.G.L., Section 31–5.1–4(C)(2) provides:

It shall be deemed a violation of this chapter for a manufacturer or officer, agent or other representative thereof ... (t)o coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with such manufacturer, or officer, agent or other representative thereof, or to do any other act prejudicial to said dealer by threatening to cancel any franchise or any contractual agreement existing between such manufacturer, and said dealer; *provided, however, that notice in good faith to any motor vehicle dealer of said dealer's violation of any terms or provisions of such franchise or contractual agreement shall not constitute a violation of this chapter.*
Emphasis added.

For a manufacturer to condition continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se. It must appear that the condition was unfair or inequitable. To hold otherwise would not only circumscribe the manufacturer's freedom to do business to an extent we cannot believe contemplated by Congress, but would lead to the absurd result that a manufacturer could not insist upon the very terms of the agreement.

*Id.* Coercion or intimidation must encompass a wrongful demand which, if surrender does not follow, will result in the imposition of sanctions. *Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d at 911. The manufacturer's reason for bringing pressure to bear upon the dealer must also be scrutinized, because the Day-in-Court Act does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer for inadequacy of representation, *id.,* nor does the Day-in-Court Act curtail the manufacturer's right to cancel or not to renew the franchise of an inefficient or undesirable dealer, *id.,*[19] nor limit its right to make legitimate business judgments as to the preferred locations of its franchises. *Golden Gate Acceptance Corp. v. General Motors Corp.,* 597 F.2d 676, 681 (9th Cir.1979); *Salco Corp. v. General Motors Corp., Buick Motor Division,* 517 F.2d 567, 573 (10th Cir.1975).

■ Moreover, the nature of the condition or demand which the manufacturer seeks to impose on the dealer is plainly relevant to a determination of the presence or absence of good faith. In *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d at 442, the First Circuit stated:

Initially, we think there is an important difference between two kinds of improper conditions that a manufacturer might impose and back up by threats. Particularly suspect under the act are conditions which benefit only, or primarily, the manufacturer—for example, requirements that a dealer purchase large stocks of vehicles, spare parts, special tools or advertising matter—as distinguished from requirements that would tend to work to the mutual advantage of both parties, for example, that the dealer improve its service, or managerial efficiency. The manufacturer can easily extort demands of the first sort, increasing its own profit at the expense of the dealer's; the act's legislative history indicates that this was of particular concern to the Congress. The latter sort, even if the demands may be thought excessive under the circumstances, should not, without more, indicate that the manufacturer is taking advantage of the dealer, or using the franchise as a weapon for extortion, since the manufacturer stands to profit from his demands only if the dealer profits as well.

*Id. Accord Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d at 561.

Although the instant action is brought under the Dealers' Law, rather than under the federal Day-in-Court Act, the Court believes that the foregoing explications of the meaning of "good faith" are pertinent to the interpretation and application of the corollary language in the Dealers' Law; and are, therefore, stars by which this Court can logically set the judicial compass in determining good faith in the termination of Scuncio's franchise.[20]

### 2. The Evidence of Good Faith

■ In support of its claim that Scuncio's franchise was terminated for good cause and that it had acted in good faith, SNE introduced substantial evidence, which is hereinbelow summarized. In 1972, when Scuncio became a Subaru dealer, SNE had eighty dealers, more or less. During that year, those dealers collectively retailed 2,164 Subaru vehicles throughout New Eng-

---

**19.** House Report No. 2850, 84th Cong.2d Sess. (1956), *reprinted in* 1956 U.S.Code Cong. & Admin.News 4596, 4603.

**20.** Indeed, Scuncio agreed that the good faith standards under the Day-in-Court Act should be followed in evaluating SNE's good faith in the present case.

land, approximately 27 cars per dealer. Joyce Affidavit at Para. 15(B). In 1982, SNE projects that its affiliated dealers will, in the aggregate, retail more than 25,000 cars, for an average of 350 cars per dealer. *Id.* As of October 31, 1982, the calendar year-to-date Subaru sales of each of the three other Rhode Island Subaru dealers total no less than 205 vehicles. The leading Rhode Island-based dealer sold 378 cars during this ten-month period. In comparison, Scuncio disposed of 90 vehicles during the same interval. Defendant's Exhibit F. At the hearing on preliminary injunction, H.J. Burbank, SNE's Vice-President for Marketing, testified that, for calendar 1981, only Scuncio and one other Subaru dealer within New England sold less than 100 Subarus annually. Burbank's testimony was crisp and straightforward; his experience in the automotive field was impressive; his data was precise, well-ordered, and had the hallmark of reliability. While not implying in any sense that Burbank was neutral or impartial, the Court, nevertheless, found his testimony to be truthful and knowledgeable.

The evidence also shows that, throughout the New England area, Subaru has for some time been increasing its sales at a dramatic pace, compared with other small, nonluxury domestic and import manufacturers such as Honda, Toyota. Chart 4, Defendant's Exhibit G. The unadorned figures offer irrefutable evidence that Scuncio has consistently lagged behind this accelerating pace. *Id.;* Defendant's Exhibit F.

Dr. Wallace Feldman, an expert witness in the field of marketing, testified on behalf of Scuncio to the effect that the automotive market in Rhode Island was weak and that Scuncio was doing an adequate job for that market. In view of Dr. Feldman's minimal experience in the specialized field of automotive marketing, and having in mind his reliance on general market trends rather than upon data regarding Subaru sales in particular,[21] the Court finds SNE's evidence regarding the growth of the Subaru market and the testimony of Burbank to be more probative than that of Dr. Feldman.

SNE also introduced into evidence the minimum space requirements of other manufacturers, including Ford Motor Company, defendant's Exhibit B and Toyota, defendant's Exhibit C, in order to show that SNE's criteria were reasonable compared with trade custom and usage.[22] Compared to the minimum standards of other car manufacturers, the Court cannot, for the purposes of the present hearing, find the SNE standards to be unreasonable as defined in R.I. G.L., Section 31–5.1–1(H).

Finally, Burbank testified regarding the experience of six other SNE dealerships in the New England region which had relocated within the recent past because, as in the case of Scuncio, there had been a failure of compliance with minimum standards. Five of the six dealerships more than tripled their yearly sales in their new locations, all within very short time frames. The sixth dealership, Burbank testified, will have doubled its sales within another year. Burbank further stated that he had reviewed the financial statements of these six dealers, and that each was enjoying increased profitability.

In response to the plaintiff's argument that SNE was draconian in requiring Scuncio to relocate and to invest in larger, more modern facilities without guaranteeing it a sufficient product supply, Burbank described the SNE vehicle allocation policy. He explained that the policy in its most elementary terms was based upon the premise that "the more sales you have, the more new cars you get." Burbank's testimony that Scuncio would have been allocated more product if it had sold more vehicles

---

21. Mr. Feldman's curriculum vitae, Plaintiff's Exhibit 5, indicated no experience whatsoever with or within the automobile industry.

22. Both Ford and Toyota manufacture automobiles directly competitive with Subaru's line. According to defendant's Exhibit B, Ford requires a minimum of 38,100 square feet of total land and building for a dealership processing a volume of 100 cars annually. Toyota requires 38,000 square feet of land and building for a dealership of the same size. Defendant's Exhibit C.

rings true, once the allocation formula is fully elucidated. Burbank further expressed confidence that, under the new national Subaru allocation policy, each dealer in New England would receive all the cars that each could profitably sell. He elaborated on the basis for this belief in some detail. The plaintiff offered no evidence to rebut SNE's explanation of the allocation system. Moreover, Mr. Scuncio admitted that SNE had promised him that SNE would guarantee a certain number of cars for three months if he relocated. Scuncio Deposition at 147. In view of the internalized mechanism of the allocation paradigm, the sale of this augmented vehicle quota would, in turn, have swollen the plaintiff's pro rata share of future allotments. The Court therefore finds, on the present record, that, under the prevailing allocation schemata, there is no credible evidence that plaintiff, had expansion been undertaken as promised, would have been deprived of a sufficient product supply.

Scuncio offered no evidence of any coercive or intimidating behavior on the part of SNE in the refranchising negotiations leading to the execution of the Agreement. Mr. Scuncio nevertheless claims that he signed the Agreement as a result of duress and harassment. Scuncio Deposition at 109–111, 115. At his deposition, however, he could only identify the following incidents, suggestive, in his mind, of harassment: (i) a telephone conversation in the mid 1970s with Mr. Bothen, an SNE employee, in which Mr. Bothen suggested that Scuncio voluntarily terminate its franchise; (ii) a conversation in 1974 with another SNE executive, Mr. Boch, in which Scuncio was told that he would have to order a parts package in order to receive more cars; (iii) suggestions by unidentified "roadmen" that Scuncio voluntarily terminate his franchise; (iv) contact reports by various "roadmen," identifying deficiencies in Scuncio's operations. *Id.* at 116–17, 123. Scuncio knew full well, however, that the "roadmen" had no power to terminate his franchise. *Id.* at 120.

The only duress Mr. Scuncio could identify was a "feeling" he had that, if he did not sign the Agreement, the franchise would be terminated. Id. at 124. He could name no individual from SNE who ever threatened that Scuncio's franchise would be terminated if the Agreement was not executed, and he referred to the claim of duress as "my gut feeling" and "(my) intuition when I talked to people." *Id.* at 124, 125. In short, the plaintiff's case, insofar as it pertains to duress, harassment and the like, is wholly conclusory in nature. When these contentions are weighed as against the facts which have been developed in the record, they are reminiscent of the "horrible imaginings" storied by the Bard of Avon.[23]

### 3. *The Good Faith Standard Applied to SNE's Actions*

Based on this record, the Court finds that the defendant has met its twin burdens, under the Dealers' Law, of demonstrating that it terminated plaintiff's franchise for good cause, and of showing that it acted in good faith. R.I.G.L. § 31–5.1–4(D).

SNE terminated the Agreement, after giving due notice as required by the Dealers' Law,[24] because Scuncio failed to comply "with a provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." Id. The standards SNE was attempting to enforce by urging Scuncio to relocate were rationally related to the maintenance of the franchise, facially reasonable, comparable to those set by other manufacturers, and not inequitable under the circumstances. Scuncio knew they were of material significance to SNE, given the history of the relocation discussions and the full panoply of the negotiations preceding the Agreement. Moreover, Scuncio had agreed that relocation was desirable and would benefit both the franchisor and the franchisee. *See*

---

**23.** W. Shakespeare, *Macbeth*, Act 1, Scene 3.

**24.** Scuncio has not contended before this Court that the notice was inadequate and/or unseasonable.

*Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d at 442. The Dealers' Law gives SNE the power to terminate a dealership, such as the plaintiff's, for failure to comply with such reasonable and material conditions. R.I.G.L. § 31–5.1–4(D)(2)(a). Therefore, the Court cannot, without more, conclude that SNE was acting in bad faith, in violation of R.I.G.L., § 31–5.1–4(A).[25] Rather, it appears to the Court that SNE was attempting by lawful means to motivate an inadequate dealer. *See Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d at 911. As the First Circuit has observed, "To hold otherwise would . . . circumscribe the manufacturer's freedom to do business." *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d at 442.

Finally, there is no evidence of coercion or intimidation on SNE's part in urging Scuncio to relocate and to sign the Agreement. To the extent that SNE's requests for relocation can be characterized as demands, they were not, from aught that presently appears of record, wrongful, a crucial element in the endeavor to show bad faith. *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d at 911.[26] To the contrary, the Court finds on this record that SNE was simply insisting on compliance with SNE's reasonable standards, something SNE had every right to do under the Dealers' Law. R.I.G.L. § 31–5.1–4(B)(4) and (c)(2).

It is also noteworthy that the relocation requests were not accompanied by threats of sanction, either expressed or fairly implied. Instead, Scuncio agreed, in negotiations and with representation by counsel, to relocate. The plaintiff then disregarded material terms of the Agreement so signed. SNE accordingly informed the plaintiff that it would terminate the Agreement.

Thus, SNE's behavior is far different than that of the manufacturer in *Shor-Line Rambler, Inc., the American Motors Sales Corp.*, 543 F.2d 601 (7th Cir.1976), in which the Seventh Circuit affirmed a finding by the jury of bad faith on evidence that the manufacturer had abruptly and unilaterally given the dealer ninety days to meet certain major conditions, for example, the sale of 360 cars, the acquisition of a used car lot and new storage facilities, and the hiring of five additional employees. *Id.* at 603. In *Shor-Line*, the dealer attempted in good faith to comply with these demands, but was unable to do so, whereupon the manufacturer immediately terminated the franchise. This is not the case at bar. Here, Scuncio had known of SNE's minimum requirements for years, and had been informed several months prior to the actual onset of the refranchising negotiations that relocation, in order to meet the minimum requirements, would be an issue in refranchising. The plaintiff was then given more than one year, under the Agreement, in which to relocate, a time period selected not by the manufacturer, but by the dealer.

Given the foregoing facts, the Court must conclude that SNE has given ample indication of being able, at a trial on the merits, to meet its burden of showing that it terminated Scuncio's franchise in good faith and for good cause, pursuant to the Dealers' Law.

### III. *Conclusion*

Although the likelihood-of-success-on-the-merits standard has been elaborately mythologized, it is merely a judicial version, couched in legal phraseology, of the same familiar question which is heard from the casinos of Monte Carlo to Manhattan's off-track-betting parlors; what are the odds? The movant must exhibit sufficient early

---

**25.** R.I.G.L. § 31–5.1–4(A) provides:
It shall be deemed a violation of this chapter for any manufacturer or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties or to the public.

**26.** There was no evidence that the minimum standards and need for relocation were pretextual and that termination of Scuncio's franchise was in fact motivated by other reasons, *Marquis v. Chrysler Corp.*, 577 F.2d 624, 633 (9th Cir.1978), such as the desire to establish a captive facility, *id.* at 631, or the failure to follow suggested pricing practices. *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d at 561.

foot at the preliminary hearing to become the front-runner. From the vantage point of the present record, the Court is constrained to observe that the odds preponderate against the eventual rendition of a verdict favorable to the plaintiff. Scuncio has not sustained its burden of showing a probability of success on the merits.[27] It follows necessarily that the Court must deny the prayer for preliminary injunctive relief.[28] It is so ordered.

---

27. Given the Court's finding that SNE acted in good faith and with good cause, the Court sees little need to address Scuncio's claims of predatory conduct, in violation of R.I.G.L. § 31–5.1–4(C)(17). Scuncio also alleges that SNE violated section 31–5.1–9, but the Court fails to understand the relevance of this section to the case at bar, and plaintiff has not provided any enlightenment on the issue.

28. Prior to the commencement of this action, SNE filed suit against Scuncio, seeking a declaratory judgment that good cause exists for the termination of the Agreement under R.I. G.L. § 31–5.1–4(D)(1)–(4). *Subaru of New England, Inc. v. Scuncio Motors, Inc.,* C.A. No. 82–2637 (D.Mass., filed Sept. 9, 1982). That action is presently pending on Scuncio's motion to dismiss. The interests of judicial economy dictate, in this Court's assessment, a prompt decision by SNE to discontinue that action without prejudice pursuant to Fed.R.Civ.P. 41(a), or to file a motion to transfer venue to this District.